COMMONWEALTH *vs.* WILLIAM C. HOWARD.

Bristol.  January 17, 1910. — February 23, 1910.

Present: KNOWLTON, C. J., HAMMOND, BRALEY, SHELDON, & RUGG, JJ.

*Homicide.  Pleading, Criminal,* Bill of particulars.  *Practice, Criminal,* Motion to dismiss indictment, Motion to quash indictment, Opening statement to jury, Judge's charge.  *Evidence,* Judicial notice, Relevancy and materiality, Remoteness, Affecting credibility of witness.  *Witness,* Impeachment.

Three counts in an indictment for murder respectively charged as the means by which the murder was committed that the defendant " with his hands or some instrument to the jurors unknown did choke and strangle " a certain woman, " did throw and push her into a certain river by means of which throwing and pushing she . . . was . . . drowned," and " with his hands or some instrument to the jurors unknown, or by some other means to the jurors unknown, did suffocate her."  The defendant moved that the Commonwealth be ordered to

---

* Evidence as to different sales testified to by the witnesses for the Commonwealth.

file a bill of particulars under each count setting forth in detail the time and place of the alleged crime and "the manner and means by and in which" the crime "is alleged to have been committed." The trial court thereupon ordered that as to each count the Commonwealth file forthwith "a statement of such particulars as shall give to the defendant reasonable knowledge of the time and place of the alleged crime and means and manner by and in which it is alleged" that the crime was committed and "a statement of such particulars as may be necessary to give the defendant and the court reasonable knowledge of the nature and grounds of the crime charged." In response thereto, the Commonwealth filed a statement that the time of the commission of the murder upon which it relied was between 10 P. M. on September 19 and 12.30 P. M. on September 20 of a certain year, that the place was "in or about that part of the town of Dartmouth called Padanaram," but that it was unable to file as to either of the counts of the indictment any further particulars which would "give the defendant or the court further knowledge of the means and manner whereby the crime was committed." The defendant thereupon filed motions that the particulars be adjudged insufficient and the indictment therefore be dismissed, and that each count be quashed and dismissed because of the insufficient bill of particulars. The motions after a hearing were overruled, and the defendant excepted and appealed. *Held,* that the exceptions must be overruled and the appeals dismissed, because the only reasonable interpretation of the record was that the final view of the trial court was either that the particulars furnished were a sufficient compliance with the court's final order, or that no full compliance was possible and therefore that none was to be required.

Where there is no statement in an indictment for murder of the time when the crime is alleged to have been committed, but the caption of the indictment states that the indictment was presented by the jurors on the "first Monday of November in the year of our Lord one thousand nine hundred and eight," and a bill of particulars filed by the Commonwealth states that the time it relied on was "between ten o'clock in the evening of September 19 and twelve thirty o'clock in the afternoon of September 20" of a certain year, an exception to and an appeal from the denial of a motion to quash the indictment because in connection with the bill of particulars it did not "plainly and concisely, or sufficiently, describe the" time of the crime, respectively must be overruled and dismissed.

Where there is no statement in an indictment for murder of the place where the crime is alleged to have been committed, but the caption of the indictment states that the indictment was presented in the county of Bristol, and a bill of particulars filed by the Commonwealth states that the place relied on was "that part of the town of Dartmouth commonly called Padanaram," this court will take judicial notice of the fact that there is only one town called Dartmouth in Bristol County, and an exception to and an appeal from the denial of a motion to quash the indictment because in connection with the bill of particulars it did not "plainly and concisely, or sufficiently, describe the" place where the crime was committed, respectively must be overruled and dismissed.

Each of three counts of an indictment for murder charged an assault and alleged that by reason of the acts described therein the victim instantly died. One count charged that the defendant "with his hands or some instrument to the jurors unknown did choke and strangle" the victim, a woman; another charged that the defendant "did throw and push her into a certain river, by means of which throwing and pushing she . . . was . . . drowned," and the last count charged that the defendant "with his hands or some instrument to the jurors unknown,

or by some other means to the jurors unknown, did suffocate " the victim.   In
response to an order that the Commonwealth file a statement of such particulars
as would give to the defendant reasonable knowledge of the means and manner
by and in which it was alleged that the crime was committed, the Common-
wealth filed a statement that it was "unable to file as to either of the counts
. . . any further particulars which will give the defendant or the court further
knowledge of the means and manner whereby the crime was committed." The
defendant moved that all the counts be quashed on the ground that they did
not, in connection with the bill of particulars, "plainly and concisely, or suffi-
ciently, describe the " act constituting the crime charged or the manner and
means by which it was committed.   The motion was denied and the defendant
excepted and appealed.   *Held*, that the exception must be overruled and the
appeal dismissed, because each count, taken in connection with the bill of
particulars, contained such particularity of allegation as might be of service to
the defendant in enabling him to understand the charge and to prepare his
defense.

In an opening statement to the jury at the trial of an indictment for murder, the
district attorney stated, as facts which he expected to prove, matters as to which
it was at least doubtful whether they might not be material in certain aspects of
the other evidence.   After such matters were stated, counsel for the defendant
asked that the statement "be struck out as an improper statement, not properly
evidence in the case."   The trial court stated in the presence and hearing of the
jury that the jury and counsel understood that "the opening is not evidence.
. . . It is not to affect the jury except as supported by evidence later.   If the
jury so understand it, I will let it stand."   And later in the charge to the jury
they were instructed accordingly.   *Held*, that there was no error in the action
of the court.

At the trial of an indictment charging the defendant with the murder of his wife
on September 19, 1908, it appeared that no one saw the alleged crime committed.
There was evidence tending to show that at the time of the alleged murder the
defendant was between twenty-five and thirty years of age; that on October 3,
1907, a second period of enlistment in the United States army had expired, for
three years before which he had been stationed at Fort Rodman in New Bedford
and had had very close, even illicit, relations with a girl named G., in whose
presence the defendant had shot a man and who had been the only eyewitness
of that act; that on October 3, 1907, the defendant went· to Tennessee where on
October 26, 1907, he married; that soon afterward he re-enlisted and returned to
New Bedford, his wife later joining him; that, by agreement between himself
and his wife, she was introduced as his sister because they feared that they
might arouse the hostility of G. which might result in the defendant's arrest for
homicide; that the wife therefore boarded away from the barracks and the
defendant lived in the barracks; that subsequently the defendant and his wife
quarrelled and she told of his having shot the man in the presence of G., which
resulted in the defendant's arrest, trial and discharge in the District Court in
July, 1908; that at this time G. learned of the defendant's marriage; that
shortly after the trial the defendant was arrested and convicted of non-support
of his wife.   There was conflicting evidence as to whether the relations between
the defendant and his wife were affectionate.   Further evidence tended to show
that on Saturday, September 19, 1908, the defendant's wife went upstairs to her
room early and got into bed, that after a few minutes she rose from the bed,
left the house by stealth and, after making a call upon a friend, took a car to
Padanaram, a part of the town of Dartmouth a few miles distant, arriving there

a little after ten o'clock in the evening. The next day her dead body was discovered floating in water two feet in depth near the bridge at Padanaram, with no mark upon it excepting a slight scratch near one eye; that at the time of her death she was from three and a half to four months advanced in pregnancy. Subject to exceptions by the defendant, the Commonwealth was allowed to introduce testimony of various witnesses as to interviews between the defendant and his wife in July and August, 1908, when he had used vile and abusive epithets toward her; evidence that the defendant had brought to his wife a bottle of laudanum, a bottle of larkspur, and a bottle containing another liquid, saying "I want to get rid of that baby"; testimony of one who stated that the defendant had said to him after the proceedings for non-support that he did not like giving his wife "$12 out of his pay because he wouldn't have enough money for himself"; testimony of a member of the New Bedford police that he had asked the defendant in the presence of his wife, "if it wouldn't be better for him to give the money to his wife instead of spending it where he was spending it," and that the defendant used vile, abusive and threatening language toward his wife; and letters which passed between S. and the defendant from October 29, 1907, to September 10, 1908, which showed that G. was infatuated with the defendant and was loyal to him even after she learned of his perfidy, which letters the defendant had kept and had not destroyed. *Held*, that the evidence excepted to was none of it too remote and was relevant and material as tending to show the defendant's attitude of mind toward his wife and a motive on his part for desiring to get rid of her.

At the trial of an indictment which charged that the defendant murdered his wife at Padanaram, a part of the town of Dartmouth, there was evidence tending to show that the defendant was seen at Padanaram at a certain time, and that, about five minutes before, the defendant's wife also was seen there, that previous to the time when she was seen at Padanaram the wife had left a house where she was boarding and had called on a friend. Subject to an exception by the defendant, the friend was allowed to testify that the wife on previous occasions had seemed depressed in spirits, but that on the occasion in question she had seemed happier, and that she had stated that she then was on her way to Padanaram to meet her husband to look at a cottage which they could have for the winter. One of the grounds of defense was that the wife committed suicide. *Held*, that the evidence was admissible as tending to show the state of mind of the wife just preceding her death, following *Commonwealth* v. *Trefethen*, 157 Mass. 180.

At the trial of an indictment which charged that the defendant murdered a woman by choking or strangling or suffocating her "with his hands or some instrument to the jurors unknown," it appeared that the body of the woman was found floating in two feet of water, that there were no marks of violence thereon and that no one saw the alleged crime committed. Medical experts for the Commonwealth, in answer to a hypothetical question, which assumed as true the facts placed in evidence by the Commonwealth, stated it as their opinion that the cause of the death was suffocation or strangulation, not drowning. There also was evidence tending to show that the defendant and the woman were both in the vicinity of the place where the body was found late in the evening preceding the time when it was found; that the defendant had been a private in the United States army for many years, and was illiterate. Subject to an exception by the defendant, the Commonwealth was allowed to introduce in evidence a soldier's handbook which was found among the defendant's effects and contained instructions and diagrams, among others, for the compression of

the carotid artery, the pages where such instructions and diagrams were found being turned down when the book was found. There also was evidence that the defendant had received oral instructions on the same subject and had been warned that if both the carotid arteries were compressed simultaneously, " there is liable to be something happen." *Held,* that the evidence was relevant and material and was admitted rightly.

At the trial of an indictment for murder, the defendant introduced evidence tending to show that, at the time of the alleged murder, he was with one W., a woman, at a place some distance from the place where the crime was alleged to have been committed, and offered to prove by another witness that he interviewed the witness on the afternoon of the day preceding that of the alleged crime and sought to engage a room at the witness's home for W. The evidence was excluded. *Held,* that it was excluded rightly, since it had no tendency to show that the defendant was not at the place of the alleged crime at the time when it was alleged to have been committed.

At the trial of an indictment for murder, a woman, W., testified on behalf of the defendant that at the time of the alleged murder the defendant was with her. Subject to an exception by the defendant, the Commonwealth was allowed to introduce in evidence letters from W. to the defendant which tended to show intimacy and friendly feeling between them. *Held,* that the letters were admissible as tending to show bias of the witness in favor of the defendant.

At the trial of an indictment for murder, it appeared that after the defendant's arrest he was examined by the chief of police of a certain city, who was a witness for the Commonwealth. The defendant sought to show that a certain woman, whose deposition afterwards was taken at the request of the defendant and was in evidence, came to the chief of police before the trial and told him that she was thinking of leaving the Commonwealth, and that he said that she need not stay, and that he did not communicate her intention to the defendant. The trial court excluded the evidence offered, without prejudice to the right to renew the offer if the evidence should " become competent later," and the defendant excepted. The offer was not renewed. The evidence taken by deposition, in connection with the other evidence in the case, was as favorable to the Commonwealth as to the defendant. *Held,* that the act of the chief of police fell far short of any tendency to show bias, and that the action of the trial court in excluding it was proper.

At the trial of an indictment for murder, it appeared that the deceased was the wife of the defendant, and that there was no eyewitness to the alleged crime, but that the wife's body was found floating in two feet of water near Padanaram bridge in the town of Dartmouth shortly after noon on a Sunday. A witness for the Commonwealth, who maintained a pavilion near Padanaram bridge, testified that a woman, dressed as was the wife when her body was found, came up the steps of the pavilion shortly before ten o'clock on Saturday night and turned away, and that about five minutes later a man walked up the platform and looked in over the counter, that he saw the same man the following day, that his accurate recollection of first speaking of the occurrence was the following Monday evening, while talking with one S. and two others; that on the following Wednesday or Thursday he identified the defendant, then in custody, as the man whom he had seen on Saturday and Sunday. S. then was called as a witness and testified, subject to an exception by the defendant, that on Sunday afternoon he had seen the defendant come into the pavilion referred to, and that that evening he had had a conversation with the proprietor of the pavilion, the

previous witness. He then answered affirmatively the question, "Whether or not the defendant that Sunday evening was the subject matter of conversation between you?" *Held*, that the evidence rightly was admitted.

An indictment for murder charged in various counts respectively that the alleged crime was accomplished by pushing the victim, a woman, into a river whereby she was drowned, by choking and strangulation, and by suffocation. There was no eyewitness to the crime. The body of the victim was found in a river in two feet of water, with no marks of violence upon it. There was evidence tending to show that the defendant and the victim were in the vicinity of the place where the body was found on the night before it was found, and that previously the defendant had been studying and receiving oral instruction with regard to the production of unconsciousness by compression of the carotid arteries. Medical experts called by the Commonwealth, in answer to hypothetical questions based on the facts in evidence, testified that the cause of the death was strangulation or suffocation. Medical experts for the defendant testified that the cause was drowning. The defendant's contention was that the deceased committed suicide. There was ample evidence of motive for the murder. The trial court refused to rule that on the evidence the verdict should be "not guilty" as to all the counts. *Held*, that the ruling was right, because the evidence was ample to warrant a verdict of guilty on each of the counts.

At the trial of an indictment for murder where the evidence is circumstantial and there is testimony by medical experts, it is proper to refuse to rule as matter of law that "opinion evidence is to be received with caution and where there is an honest difference of opinion among qualified experts the jury ought not to convict."

At the trial of an indictment for murder it is proper to refuse to rule as matter of law that "Evidence as to oral statements alleged to have been made by the defendant should be received with caution."

At the trial of an indictment for murder the following instructions contained in the charge to the jury on the question of evidence which tended to show a motive for the alleged crime were held to be clear and correct: "Motive is no part of the offense charged, and the Government is not obliged in any case to prove a motive for murder, yet, evidence tending to show a motive is always competent, because if a motive for the crime is clearly shown, it may help to confirm the conclusion reached from all the other evidence, that the accused has committed the offense charged. While motive is not an essential ingredient of the crime of murder and it may be committed without a motive, yet it never can be committed without an intent, and as bearing upon the question of intent, motive or absence of motive may present considerations of the utmost importance. Motive often furnishes corroboration of intent in a case depending upon circumstantial evidence, and as this case depends upon circumstantial evidence, where a motive is shown and clearly established, such evidence of motive is competent for the consideration of the jury in connection with all the evidence in the case as bearing upon the intent with which the crime was committed, and on the other hand, absence of motive even if not conclusive may be considered as bearing upon the question of intent."

At the trial of an indictment charging the defendant with the murder of a woman who was his wife, there was evidence tending to show that the defendant and his wife had quarrelled, that he was annoyed at the approaching birth of a child and had attempted to induce her to procure an abortion, and that he had used vile epithets and abusive language toward her and had threatened her, and that he had been

convicted on a complaint by her charging him with non-support.  The following instructions, contained in the charge to the jury as to such evidence, were held to be clear and correct:  " There has also been some evidence introduced tending to show that the prisoner had tried to induce his wife to take certain medicines or drugs for the purpose of procuring her miscarriage ; and also evidence tending to show that the prisoner had been arrested for failure to support his wife.  All the evidence on these various matters is not competent except so far as it bears upon the relations of the prisoner with his wife, in so far as it tends to show a motive for the offense for which he is now being tried.  The jury should not consider any of this evidence as having any bearing upon the case except so far as it may or may not indicate a motive on his part to kill his wife.  The fact, if it be a fact, that a person has committed a crime is not evidence that he has committed another crime."

At the trial of an indictment charging the defendant with the murder of his wife, there was evidence tending to show that before his marriage he had had intimate, even illicit, relations with one G. whom he had deceived as to his marriage, and that he had continued such intimate relations after the marriage ; that, after G. discovered how he had deceived her, and after the defendant had quarrelled with his wife, G. still remained faithful to him.  Letters between G. and the defendant were introduced in evidence.  The following instructions, contained in the charge to the jury on the subject of such letters, were held to be clear, correct and sufficient:  " Certain letters claimed to have been written by the prisoner to G., and other letters claimed to have been written by G. to the prisoner have been admitted in evidence.  All these letters were admitted solely, so far as they had any bearing upon the relations existing between the prisoner and G., as bearing upon the question whether the prisoner did or did not have any motive for committing the offense charged.  These letters should not be considered by the jury for any other purpose."

INDICTMENT, returned on November 6, 1908, charging the defendant with the murder of Ida Howard.

The first count of the indictment charged that the defendant " did assault and beat Ida Howard with intent to murder her by choking, suffocating or drowning her, and by such assault and beating did kill and murder Ida Howard."  The second count charged that the defendant " did assault and beat Ida Howard with intent to murder her ; and with his hands or some instrument to the jurors unknown did choke and strangle her ; of which choking and strangling the said Ida Howard then and there instantly died.  And so the . . . [defendant] . . . the said Ida Howard, did kill and murder."  In the third count it was charged that the defendant " did assault and beat Ida Howard with intent to murder her ; and did throw and push her into a certain river, by means of which throwing and pushing, she, the said Ida Howard, was then and there drowned, of which drowning she then and there instantly died," and that thus the murder

was accomplished.  The charge in the fourth count was that the defendant " did assault and beat Ida Howard with intent to murder her; and with his hands or some instrument to the jurors unknown, or by some other means to the jurors unknown, did suffocate her, of which suffocating the said Ida Howard then and there instantly died," and that thus the murder was accomplished.

On December 10, 1908, the defendant moved that " the Commonwealth be ordered to file a bill of particulars, under each indictment and each count of each indictment against him, setting forth fully and in detail the time and place of the alleged crime with which he is charged and the manner and means by and in which it is alleged to have been committed."  The motion was heard by *Bishop*, J., who made the following order: " If the Government intends to proceed upon the first count, specifications are ordered to be filed within ten days, stating the means and manner with as much particularity as can be without disclosing the evidence.  The motion is disallowed as to counts two, three and four.  No question is made as to time and place."

The district attorney then filed a bill of particulars containing the same specifications as those stated in the bill which is quoted in the opinion, the only difference in form being that in this first bill of particulars the last paragraph as it appears in the bill quoted in the opinion was repeated as to the second, third and fourth counts of the indictment.

There was a rehearing as to the motion for particulars before *Crosby*, J., and an order was made which is quoted in the opinion, where also are stated fully the further proceedings preceding the trial.

The case was tried before *Crosby* and *Sanderson*, JJ.

The statement made by the district attorney in his opening, which is referred to in the opinion, was made in reference to the feeling that the defendant had displayed toward Ida Howard, his wife, and was as follows: " About two weeks after this first trial to which I have referred, his wife had him arrested for non-support; she was some five months along in a family way, . . . and it became time, if ever there was a time, when this defendant was called upon by her to contribute to her support.  This was after

the other trial in the court [the trial as to the Dewhurst incident, referred to in the opinion], and he hadn't done anything, and wouldn't do anything, and said he wouldn't do anything, and the only recourse left was for Ida Howard to go to law, and she goes down to the police court and there makes complaint, and the defendant is brought into court, found guilty of non-support, fined a small fine, rather than pay it goes to jail, and states, if I recall aright, that he never would pay it. He is in jail several days."

The witness Johnson, referred to in the opinion, testified without objection that he and the defendant were in the hospital in Fort Rodman together in the summer of 1908 and had talks together, and that the defendant, " in referring to the trouble that his wife had caused him by having his pay attached, said 'I'll get rid of her or get rid of myself.'" Subject to an exception by the defendant, he then testified that in August, 1908, the defendant made to him the statement quoted in the opinion.

The witness Butts, referred to in the opinion, testified that he was a member of the New Bedford police, and that he spoke to the defendant about the support of his wife. Subject to an exception by the defendant, he then was allowed to state that he asked the defendant " if it wouldn't be better for him to give the money to his wife instead of spending it where he was spending it "; that the defendant cursed and swore and told his wife he was sorry he had married her and wished she was back where she came from, and threatened her; that the wife said he struck her, and that she would go and give him away, and he said, " Go, God damn you, I will shoot you and the cop both coming up the stairs "; that the defendant told his wife that, if she had him arrested for non-support, she would be sorry for it. The witness further testified that he went with the defendant to his wife's boarding place and witnessed a quarrel between them, in which the defendant said that the child she was going to have was not his, and used abusive language to her.

Alice Forbes, besides the testimony described in the opinion, testified that the defendant had used profane and abusive language to his wife, had refused to pay his wife's board, and had said to her, " I am through with you; I am through for good and mark my word. If you have me arrested for non-support, I will

fix you "; that Mrs. Howard had said, " You will have to contribute something toward my support. I am in a delicate condition "; that the defendant said, " I know when you expect that damned thing, and it don't belong to me anyhow "; that Mrs. Howard began to cry and that the defendant said, " It's all bosh "; that before he went out the defendant said to his wife, " I'll fix you, and some day people will wake up and find you with your head hanging out of the window "; and that the wife said, " Yes, you have said that a number of times."

Freeman A. Forbes testified that he was present and heard a conversation between the defendant and his wife, in which the defendant called his wife vile names.

The witness Edwards, referred to in the opinion, first was asked " Whether or not [the defendant] arranged with you [on the afternoon of Friday preceding the murder] for a woman to stop at your house the following night "? The defendant's counsel, in response to a question by the court, " On what ground are you offering that ? " stated : " Later we are going to bring evidence that the woman that Howard was with Saturday night was to put up at Edwards's house, and that on Friday afternoon Howard had gone to his shop for the purpose of making arrangements for this girl to stay at his house that Friday night." The question then was reframed as follows : " Did Howard arrange with you, that Friday afternoon, for Lena Watson to spend the next night, being Saturday night, at your home ? " and was excluded subject to an exception by the defendant.

One Hart, a witness for the Commonwealth, testified that on the night of September 19, 1908, he was in a pavilion which he conducted at Padanaram ; that after the 10.15 P. M. car left for the city that night, he saw a woman come upon the steps of the pavilion, dressed in dark clothing with a brown veil tied over a medium-sized hat [this description corresponds to that of the costume Mrs. Howard had on when her body was found] ; that after hesitating for a moment, she went away ; that about five minutes later a man walked up to the platform of the pavilion and looked in over the counter ; that the man was dressed in dark civilian clothing and wore a soft hat ; that he saw the same man the following day ; that the man was then dressed in regulation fatigue uniform and fatigue cap ; that on the following Wed-

nesday or Thursday he went to the House of Correction and picked out the defendant, who was dressed in civilian's clothes, as Howard; that Howard was the man he saw on his pavilion on Saturday night. In cross-examination, he testified that his accurate recollection of first speaking of the occurrence of the previous Saturday night was Monday evening, September 21, while talking with David Simmons, and two others.

David Simmons, called for the Commonwealth, testified that on the night of September 19, 1908, he was in Hart's pavilion at Padanaram until between 10.10 and 10.20 P. M.; that the next afternoon he saw the defendant come into the pavilion; and that that evening he had a conversation with Hart. Subject to an exception by the defendant, he then was asked, " Whether or not the defendant Howard that Sunday evening was the subject matter of conversation between you ?" and answered affirmatively.

Besides the evidence already stated, and that stated in the opinion, there was evidence, regarding the movements and whereabouts of the defendant on the night of the homicide, tending to show that he was seen at Fort Rodman by several witnesses between 6 and 7 P. M.; that he stated to one Sergeant Riley that he would leave the Fort and return or " mark in " at 2 A. M. and that he was going fishing for eels; that he was seen soon after 6.30 P. M. with two oars hiding behind the sea wall on the easterly side of the Fort and said to the sentinel that he had taken Lacey's oars, and asked the sentinel not to tell any one he had seen him; that the sentinel a short time later saw some man row away; that at about eight o'clock the defendant was seen on the reservation going toward the west side of the reservation; that one Doyle, at the defendant's request, took the boat from the defendant and rowed it around to the garden at the westerly side of the reservation where he again met the defendant who took the boat and rowed off at some time between 7 and 9 o'clock P. M.; that it would take about an hour and twenty or twenty-five minutes to row from the westerly side of Fort Rodman reservation to Padanaram bridge; that the defendant was seen at Hart's pavilion, which was near the bridge, at about 10.30 P. M.; that a man and a woman were seen on Padanaram bridge at different times between 10.45 and 11.30 o'clock that evening; that between 11.45 P. M. and midnight a woman's muffled scream was heard, coming

from the direction of the bridge; that the defendant was seen on the reservation at about 2.30 A. M. coming from the direction of the wharf; and that he " marked in " some time between 2.30 and 2.55 A. M.

There also was evidence tending to show that the defendant had studied the handbook, referred to in the opinion, with regard to the effect of compression of the carotid artery, and the diagrams in that book illustrating means of compression; that he had taken instruction from one Doyle as to the method of compression, and that Doyle had told him not to compress both arteries at the same time " because there is liable to be something happen."

Experts for the government in answer to a hypothetical question based on testimony as to the condition of the body when found and afterward, and other facts in the case, testified that in their opinion the cause of death was suffocation or strangulation, not drowning. They also testified that pressure upon both carotid arteries would produce unconsciousness in about twenty seconds. Experts for the defense testified that in their opinion the cause of death was drowning.

There also was testimony that when arrested the defendant told the police that he was on the reservation all the night of September 19; that he was with one Friley at the hospital from 9 to 11 P. M. and went to bed at 12 o'clock; that the defendant admitted writing a letter at 8 o'clock on the morning of the twentieth before he was arrested to Friley something like this, " Friend Friley, I will ask you to help me to establish an alibi. I want you to say that you were with me from 9.30 to 11 Saturday night. Destroy the letter and don't let any one see it." There was evidence from Friley and other soldiers that the alibi then attempted to be set up by the defendant was false.

The defendant produced a witness, Lena Watson, who said that she and her mother arrived in New Bedford at 6.30 P. M., September 19, took a car at the waiting room at 7.30, arrived at Fort Rodman about 8 o'clock, met the defendant on the westerly side of the reservation and stayed there with him until after 11 P. M. Certain street railway men testified that the car leaving the waiting room at 7.30 P. M. for Fort Rodman did not arrive there that night; that on account of a broken wire there were

no cars running either north or south on the Fort Rodman line between 7.10 or 7.15 and 8.20 P. M. that night.

At the close of the evidence, the defendant asked the trial court to rule that a verdict of not guilty should be returned on each of the remaining three counts, and as follows:

" 4. There is no evidence that Ida Howard was murdered sufficient to justify submitting that question of her murder to the jury.

" 5. Opinion evidence is to be received with caution, and where there is an honest difference of opinion among qualified experts the jury ought not to convict."

" 9. Evidence as to oral statements alleged to have been made by the defendant should be received with caution.

" 10. The defendant requests full instructions as to his rights in not taking the witness stand, on the question of motive, and, in connection therewith, the Sturtevant letters, and on the question of reasonable doubt."

" 13. If the jury are left in doubt as to the manner in which the deceased lost her life, they ought not to convict."

That portion of the charge of the jury which referred to motive, to which the defendant excepted, was as follows:

" Motive is no part of the offense charged, and the government is not obliged in any case to prove a motive for murder, yet, evidence tending to show a motive is always competent, because if a motive for the crime is clearly shown, it may help to confirm the conclusion reached from all the other evidence, that the accused has committed the offense charged.

" While motive is not an essential ingredient of the crime of murder and it may be committed without a motive, yet it never can be committed without an intent, and as bearing upon the question of intent, motive or absence of motive may present considerations of the utmost importance.

" Motive often furnishes corroboration of intent in a case upon circumstantial evidence, and as this case depends upon circumstantial evidence, where a motive is shown and clearly established, such evidence of motive is competent for the consideration of the jury in connection with all the evidence in the case as bearing upon the intent with which the crime was committed, and on the other hand, absence of motive even if not

conclusive may be considered as bearing upon the question of intent."

The portion of the charge which referred to the relations between the defendant and his wife and to the Sturtevant letters, to which the defendant excepted, was as follows :

" There has also been some evidence introduced tending to show that the prisoner had tried to induce his wife to take certain medicines or drugs for the purpose of procuring her miscarriage ; and also evidence tending to show that the prisoner had been arrested for failure to support his wife. All the evidence on these various matters is not competent except so far as it bears upon the relations of the prisoner with his wife, in so far as it tends to show a motive for the offense for which he is now being tried. The jury should not consider any of this evidence as having any bearing upon the case except so far as it may, or may not, indicate a motive on his part to kill his wife. The fact, if it be a fact, that a person has committed a crime is not evidence that he has committed another crime.

" Certain letters claimed to have been written by the prisoner to Grace Sturtevant, and other letters claimed to have been written by Grace Sturtevant to the prisoner, have been admitted in evidence. All these letters were admitted solely, so far as they had any bearing upon the relations existing between the prisoner and Miss Sturtevant, as bearing upon the question whether the prisoner did or did not have any motive for committing the offense charged. These letters should not be considered by the jury for any other purpose."

The jury found the defendant guilty of murder in the second degree ; and the defendant alleged exceptions.

*J. M. Morton, Jr.*, (*E. T. Bannon* with him,) for the defendant.

*J. M. Swift*, District Attorney, (*F. B. Greenhalge*, Assistant Attorney General, with him,) for the Commonwealth.

HAMMOND, J. 1. As to the various motions to dismiss, to quash and to dismiss, and to quash. After the plea of not guilty the defendant moved as to each count of the indictment for a bill of particulars setting forth fully and in detail the time when, the place where, and the manner and means in and by which the alleged murder was committed. Such proceedings were taken upon this motion as finally resulted in an order by

the court that the Commonwealth file forthwith " a statement of such particulars as shall give to the defendant reasonable knowledge of the time and place of the alleged crime, and the means and manner by and in which it is alleged to have been committed; and shall also file a statement of such particulars as may be necessary to give the defendant and the court reasonable knowledge of the nature and grounds of the crime charged, and that all such particulars shall be so filed as to the second, third and fourth counts of the indictment."

Thereupon the district attorney filed the following paper entitled an " additional bill of particulars ":

" And now comes the district attorney and in compliance with the order of the court upon defendant's motion for bill of particulars sets forth the following particulars:

" The time which the Government relies on when the murder was committed is between ten o'clock in the evening of September 19, 1908, and twelve thirty o'clock in the afternoon of September 20, 1908.

" The place where it is claimed the murder was committed is in or about that part of the town of Dartmouth commonly called Padanaram.

" As to the means and manner whereby the murder was alleged to have been committed, the Commonwealth is unable to file as to either of the counts of the indictment any further particulars which will give the defendant or the court further knowledge of the means and manner whereby the crime was committed."

The defendant moved that the particulars be adjudged insufficient and the indictment dismissed on that account; and further as to each count filed a motion that the count be quashed and dismissed because of the failure of the Commonwealth to file a proper and sufficient bill of particulars thereunder in accordance with the order of the court. The motion was denied and the defendant " excepted to and appealed from such denial."

The defendant further filed as to each count a motion to quash, which so far as respects the last three counts upon which alone the case was tried, set forth the following grounds: " For that it [the count] does not in connection with the bill of particulars heretofore filed thereunder by the Commonwealth

plainly and concisely, or sufficiently, describe the act constituting the crime with which the defendant is thereby charged, or the time, place, manner and means by which said crime was committed; and because said third count in connection with the bill of particulars filed thereunder does not plainly and fully, substantially and formally describe the crime with which the defendant is charged."

Upon the hearing on this motion the district attorney nol prossed the first count and the motion was thereupon overruled, and the defendant excepted to and appealed from the order overruling the motion.

It is argued by the defendant that the district attorney's statement that the Commonwealth could not furnish the information was a subterfuge and evidently was so regarded by the court, for the final order was made after such a statement had been once filed by the district attorney; and that this final order amounts to an adjudication to that effect. Whether the statement of the district attorney was a subterfuge or not was a matter for the trial court, and that court may well have come to the conclusion that in view of the difficulties of the situation the statement of the district attorney as to knowledge of the precise way in which the murder was committed was true, and that it would be unjust to hamper the prosecution by compelling it to guess, and to hazard its case on the accuracy of the guess. And the fact, if it be a fact, that the court at one time in the proceedings thought that the statement of the district attorney that he could specify no further than he had done was no excuse for not specifying further, furnished no reason why the court, upon additional evidence, argument or reflection, could not modify its view and change its course accordingly. The final view of the court seems to have been either that the specifications were a sufficient compliance with its final order, or that no full compliance was possible and therefore not to be required. There is no other reasonable interpretation of the record. The motions to dismiss and "to quash and dismiss," even if otherwise unobjectionable, were therefore rightly overruled. The prosecution had complied with the order so far as the court finally required.

The motion to quash, which is applied to each of the last three

counts, raises the question whether they each in connection with the particulars actually furnished are sufficient in law. These counts were drawn up apparently under R. L. c. 218, §§ 17 *et seq.* (formerly St. 1899, c. 409). The time is not stated in either count, but it is provided in § 20 of that chapter that the "time and place of the commission of the crime need not be alleged unless it is an essential element of the crime." Neither time nor place are an "essential element" of the crime of murder within the meaning of this term as used in this part of the section, and hence they need not be inserted in the body of the count. The provision immediately following the language above quoted is therefore applicable, namely, "The allegation of time in the caption shall, unless otherwise stated, be considered as an allegation that the act was committed before the finding of the indictment, after it became a crime, and within the period of limitations." It may be noted in passing that in the case of murder there is no limitation as to the time within which an indictment may be found. R. L. c. 218, § 52. The time given in the caption is the "first Monday of November in the year of our Lord one thousand nine hundred and eight." The bill of particulars specifies the time of the committal of the murder as "between ten o'clock in the evening of September 19, 1908, and twelve thirty o'clock in the afternoon of September 20, 1908." There is nothing to show that this specification was not as definite as the prosecution could have safely made, or the defendant could have reasonably needed for the proper preparation of his defense; and it was much more definite than the defendant would have been entitled to as matter of right under the common law.

This same section (§ 20) contains also the following: "The name of the county and court in the caption shall, unless otherwise stated, be considered as an allegation that the act was committed within the territorial jurisdiction of the court." The territorial jurisdiction of the court was the county of Bristol. The bill of particulars describes the place as "that part of the town of Dartmouth commonly called Padanaram." The court will take judicial notice that in Bristol County there is only one town called Dartmouth, and the evidence shows that a part of that town is called Padanaram. It is manifest that each count

of the indictment taken in connection with the bill of particulars sufficiently designates the place.

As to the manner and means, each count charges an assault; the second count charges that the defendant " with his hands or some instrument to the jurors unknown,.did choke and strangle" the victim ; the third count that he " did throw and push her into a certain river, by means of which throwing and pushing she . . . was then and there drowned," and the fourth count that he " with his hands or some instrument to the jurors unknown, or by some other means to the jurors unknown, did suffocate " her.  Each count charges an assault and alleges that by reason of the acts thus therein set forth the victim instantly died.

The rules of law require the grand jury to state their charge with as much certainty as the circumstances of the case will permit, but if the circumstances will not permit a fuller and more precise statement a count that charges an assault upon the deceased in some way and manner and by some means, instruments and weapons to the jury unknown is not invalid for indefiniteness.  *Commonwealth* v.  *Webster*, 5 Cush. 295. There can be no doubt that each count of the indictment in the case before us, when taken in connection with the bill of particulars and interpreted in the light of the statute, R. L. c. 218, §§ 15–40, both inclusive, contains all the essentials of a common law count.  *Commonwealth* v. *Desmarteau*, 16 Gray, 1. *Commonwealth* v. *Holmes*, 157 Mass. 233.    *Commonwealth* v. *Coy*, 157 Mass. 200.   *Commonwealth* v. *Snell*, 189 Mass. 12.

As to the defendant's general contention that the crime is not fully and plainly, substantially and formally described to him as required by the twelfth article of the Declaration of Rights in the Constitution of the Commonwealth, it is sufficient to quote from *Commonwealth* v. *Robertson*, 162 Mass. 90, 96, the statement that these provisions for the  protection of the accused person " only require such particularity of allegation as may be of service to him in enabling him to understand the charge and to prepare his defense."   Each count taken in connection with the bill of particulars and read in the light of the statute complies with this rule.   The motion to quash was therefore rightly overruled.

2.  The jury were instructed that the statements made in the

opening of the case by the district attorney to which the defendant objected were not to be regarded by the jury unless subsequently proved. While counsel in opening a case should not be allowed to state facts which are plainly irrelevant to the issues on trial and which therefore are inadmissible, still it is to be remembered that it is not the practice to pass upon the admissibility of evidence during the opening but to leave questions of that kind to be passed upon subsequently, when in the due course of the trial the evidence is offered. It frequently happens that counsel acting in good faith state facts deemed by them to be material which subsequently are ruled by the court to be immaterial. In a case of doubt the counsel usually is allowed to proceed and the jury are instructed to pay no attention to the statement unless subsequently proved. It was, to say the least, doubtful whether these facts after all might not in certain aspects of the other evidence be material. Moreover the defendant did not make any objection until the words were spoken, and his motion then was that the statement " be struck out . . . as an improper statement, not properly evidence nor in the case." The court in substance granted the motion when it said in the presence and hearing of the jury that the jury and counsel understand that "the opening is not evidence." "It is not to affect the jury except as supported by evidence later. If the jury so understand it, I will let it stand." And in the charge to the jury they were so instructed. In any aspect of the matter there does not appear to be any error in this action of the court.

3. During the trial various exceptions were taken by the defendant to the rulings as to admission and exclusion of evidence. They will be considered substantially in the order in which they are argued on the defendant's brief.

Before considering the exceptions in detail it may be well to take a general view of the situation at the trial. Many of the facts are not now in dispute. At the time of the alleged murder the defendant was between twenty-five and thirty years of age. He enlisted in the army of the United States for the second time in 1904, and was sent to Fort Rodman in New Bedford. This enlistment expired on October 3, 1907, and he went to Tennessee, where he was acquainted. He married there, on October 26, 1907, Ida Williams. Soon after his marriage he enlisted for

the third time as a private and returned to New Bedford, where he remained. Soon after his return his wife joined him, and for several months, by agreement between them, passed as his sister. It was contended by the defendant that the reason of this deception was in substance that some time before the expiration of his second enlistment, and while in the company of a girl whose name was Grace Sturtevant, the defendant had shot a man named Dewhurst; that no one knew of his part in the affair except her; that although the shooting was justifiable yet the defendant did not want his connection with the matter known, and that it was not known or suspected; that it was feared by the defendant and his wife, to whom he had confided the story of the shooting, that Miss Sturtevant, if informed of the marriage, might become angry and notify the police about the Dewhurst affair and turn against him in her testimony. For several months Miss Sturtevant was not aware of the marriage, the defendant's wife being known to her only as his sister.

The evidence tends to show that at last, as a result of a quarrel between the defendant and his wife, the latter revealed the story of his connection with the Dewhurst affair, and he was arrested; and on or about July 21, 1908, after a trial in the District Court, he was discharged. About the time of this trial Miss Sturtevant first became aware of the marriage. The evidence tends further to show that the relations between the defendant and her were very close, even illicit, that this intercourse began before the expiration of the second enlistment and continued with more or less interruption up to the time of the death of his wife.

The evidence as to whether the relations between the defendant and his wife were of an affectionate nature was conflicting. He lived in the barracks while she lived away from there, sometimes working and sometimes boarding, he paying her board.

There was evidence that on Saturday, September 19, 1908, early in the evening, she went upstairs to her room in her boarding house and got into bed; that after a few minutes she rose from the bed, left the house by stealth and after making a call upon Miss Isherwood took a street car for Padanaram, a part of Dartmouth a few miles distant, arriving there a little after ten o'clock that same evening. The next day about noon her dead body was discovered floating in water two feet in depth,

near the bridge at Padanaram. With the exception of a slight scratch near one eye there appeared no mark upon the body. At the time of her death she was from three and a half to four months advanced in pregnancy.

It was the theory of the Commonwealth that after she arrived at Padanaram she met the defendant by appointment, and that he murdered her in some one of the ways respectively set forth in the three counts of the indictment. The defendant denied that he had anything whatever to do with the death, and introduced evidence tending to prove an alibi. He also maintained that death was by suicide; and there was evidence in favor of this view. No one testified as an eyewitness to the assault. The evidence was entirely circumstantial upon that point.

Upon the evidence the Commonwealth contended that the defendant's motive for the crime was his desire to be rid of his wife; that he had a feeling of hostility towards her, based among other things upon the fact that she had caused his arrest and imprisonment for failure to support her, and upon his desire to be free to marry Grace Sturtevant. There was also evidence from which the jury might properly have found that he regarded her as an annoying and expensive burden, and that he felt, especially in view of her pregnancy, that the burden would grow more and more intolerable.

It is manifest that a trial involving the question of the existence of such a motive or cause for the murder might lead to a pretty extensive inquiry into the relations existing between the defendant and his wife. In conducting such an inquiry much must be left to the discretion of the trial court. It is not necessary that any piece of evidence offered should of itself be sufficient to prove the hostile feeling in order that it may be admitted. It is enough if it has some tendency to prove such feeling. Care however should be exercised not to resort to proof of circumstances too remote in time or cause. As said by Colt, J., in *Commonwealth* v. *Abbott*, 130 Mass. 472, 474, " It is difficult, in dealing with this description of evidence, to define, as matter of law, the precise limits which must practically control its admission "; and as before stated, much must be left to the discretion of the trial court. In the case before us there is no

trouble on the score of remoteness of time, and the only question as to much of the evidence admitted against the defendant's exception as to the relations between him and his wife is whether it has any bearing whatever on the alleged feeling of hostility or of the other elements of motive.

As bearing upon that question we think that the testimony of the witness Johnson that the defendant said to him that he did not like the idea of giving his wife " $12 out of his pay because he wouldn't have enough money for himself," as well as the testimony of the witness Freeman A. Forbes concerning the language used by the defendant to his wife, was pertinent and properly admitted. The same may be said of the harsh and profane language between the defendant and his wife as testified to by Alice Forbes; and also of the conversation between Butts and the defendant. It is argued by the defendant that the question with which Butts opened the conversation with the defendant, namely, whether "it wouldn't be better for him [the defendant] to give the money to his wife instead of spending it where he was spending it," is something not said by the defendant but by Butts; that it impliedly charged the defendant with another crime, namely, non-support of his wife, and had not the slightest bearing on the issues then on trial. But the simple answer is that it was not admitted for that purpose. It constituted the beginning of a conversation which was admissible, and it was useful in ascertaining the full meaning of what the defendant said in reply.

The evidence of the witness Alice Forbes that the defendant brought to his wife a bottle of laudanum, a bottle of larkspur and a bottle containing another liquid, saying "I want to get rid of that baby," although quite remote was also admissible. Whether his desire to get rid of the baby was due to a belief on his part that he was not the father of it, — an idea which the evidence shows he, whether sincerely or not, once at least expressed to his wife, — or whether he thought that being in that condition she was and would continue to be more burdensome to him, it might have been regarded by the jury as an indication of the relations between the parties and of his desire to get rid of her in her then condition. Especially is this so when it is remembered that either because of her refusal to attempt abor-

tion, or of her failure to effect it if she had made the attempt, abortion was not effected.   Her condition to which he had seemed to object continued to the time of her death.

In support of his exception to the admission of this evidence the defendant says among other things that it practically put the defendant on trial for a separate and independent crime. We cannot agree with the counsel in this statement, but even if it were evidence of another crime it nevertheless would be admissible if material on the issues on trial.   See *Commonwealth* v. *Choate*, 105 Mass. 451, and *State* v. *Lapage*, 57 N. H. 245, for a discussion of the law on this point.   As to the bottles introduced, it is enough to say that they were only incidental to the conversation, and while unimportant still there was no error in admitting them.

The defendant excepted to the admission of certain letters which passed between Grace Sturtevant and him, of which twelve were written by her and five by him. In admitting these the trial court said to the defendant's counsel, "If there is any special matter in the letters to which you object in addition to your general objections, the court would like to have you call it to the court's attention as the letters are read.   Only such matters as bear on the motive are supposed to be admitted by the court.   If there is anything which in your judgment does not bear on that, if you will call it to our attention we will pass on it."   No special objection having been made, only the general exception is to be considered.

Were they admissible as material on the question of motive? Previously to the introduction of the letters Grace Sturtevant, called by the Commonwealth, had testified *inter alia* that she first became acquainted with the defendant in June, 1905; that they became friendly; that she was with him one night at Hazelwood Park; that the occurrences of that night (apparently alluding to the Dewhurst homicide) were kept a secret between them; that in consequence of the defendant's arrest for what happened that night she testified at his trial in the lower court; that before his enlistment expired in 1907 a marriage between them had been talked of; that when he returned he introduced to her Ida Howard, the deceased, as his sister; that after she knew of the defendant's marriage she continued friendly with him; that

the defendant had spoken to her about getting a divorce from his wife; that he told her on Friday, September 18, 1908, that his wife was getting ready to go back to Tennessee; that she and the defendant had corresponded at various times; and that "they had returned their letters."

On cross-examination she testified that she knew "he had other girls . . . and made no objection," and that the evening after the Dewhurst trial he called at her house and asked her forgiveness for the way he had treated her. She also testified that before the Dewhurst trial the defendant made an effort to close the relations which existed between them.

The letters written by her were certainly remarkable. They show that she was infatuated with him, and that notwithstanding the way in which he had treated her and deceived her, and notwithstanding his marriage, she still clung to him even to the last. The letters by him express great desire on his part to see her.

The correspondence shown upon the record before us begins with her letter of October 29, 1907, three days after the defendant's marriage, and ends with hers of September 10, 1908, covering a period of ten and a half months, during which time many events had occurred likely to test her affection for and loyalty to him; and still she stood the test.

These letters from her he did not destroy. He kept them, and the jury may well have found that he cherished them; that bad and immoral as he was he saw something attractive in this steadfast friendship whether pure or impure, and that the idea of the possibility of a legitimate enjoyment of it by means of a marriage had been gradually taking possession of him. Or they may have found that even if the relation was to continue immoral he nevertheless cherished it as desirable. In either event the jury might well find that this relation might have a bearing upon the question whether he desired to be rid of his wife. It is objected by the defendant that some of the earlier letters are too remote, but that is untenable. They all tend to show the same state of mind; and the length of time is material on its nature and steadfastness. Of course the letters of the defendant were admissible; and we think that the whole correspondence was admissible on the question of motive.

On her way from her boarding house to Padanaram the deceased called upon Mrs. Isherwood. This person, called by the Commonwealth, testified that the deceased had called upon her previously and on such occasions had seemed depressed in spirits ; but that on this visit she seemed in a happier frame of mind. The witness was then asked whether in the course of the conversation the deceased stated to her that " she was then on her way to Padanaram to meet her husband to look at a cottage which they could have for the winter." The witness replied in the affirmative. The defendant did not object to the form of the question but did object to the substance. The question and answer were admitted and the defendant excepted.

One of the grounds of defense was that the death was suicidal, and in support of this theory evidence was introduced of the despondency of the deceased and of some of her other characteristics as well as of other circumstances. It was material for the Commonwealth to show that her journey to Padanaram that night was not for the purpose of committing suicide. Even if it be assumed that her declaration made but a few hours before her death and while in the very act of going to that place is not admissible as *res gestae* (as to which we give no opinion), yet it is plainly within the rule laid down in *Commonwealth* v. *Trefethen*, 157 Mass. 180 ; and it is necessary only to refer to that case for the reasons therefor.

The soldier's handbook containing instructions and diagrams, among which were instructions for the compression of the carotid artery, was properly admitted. It was the book of the defendant and the leaf at that place was turned down, and it may fairly be inferred that he had studied that part of the book with some care. He had also received oral instructions on the same subject. From the absence of any marks of violence upon the throat at the time the body was found, it might have been argued in behalf of the defendant that it would be impossible for him, apparently an illiterate man and having no other than common knowledge of the throat, to have done the deed by violence without leaving any mark. To meet this argument it was competent to show that he had been studying the matter. And this would be so even if, as contended by the defendant, there was no evidence that death was caused by compression of the

carotid artery. The manner in which the evidence tended to show that death occurred is nearly enough allied to the compression of the artery.

The question to Edwards was properly excluded. The fact that the defendant engaged a room for the Watson girl for Saturday night has no tendency to show that he was not at Padanaram at the time of the alleged murder. He cannot make evidence that way. *Commonwealth* v. *Kent*, 6 Met. 221.

The letters written by Lena Watson were admissible as tending to show intimacy and friendly feeling between her and the defendant and a consequent bias on her part in his favor. If the defendant had · desired that that part of the first letter which related simply to the immorality of the witness should be stricken out, and that motion had been overruled, a different question would have been presented ; see *Commonwealth* v. *Churchill*, 11 Met. 538 ; but his objection being to the whole letter, it was rightly overruled.

The defendant offered to show by Henry W. Mason, the chief of police of the city of New Bedford, a witness called by the Commonwealth,* that Mrs. Bradford, whose deposition, taken on motion of the defendant, was put in by him at the trial, came to the witness and told him that she was thinking of leaving the Commonwealth, and he said she need not stay and did not communicate her intention or what he said to her to the defendant. The court excluded the evidence offered and the defendant excepted. In support of his exception the defendant urges that the evidence was admissible as tending to show an effort by the Commonwealth to suppress evidence relating to the matter in issue ; that if admitted it would have furnished a ground upon which the defendant might have legitimately argued that the witness had not endeavored to present fairly the circumstances surrounding the death but had desired to prevent material evidence from being presented to the jury, and thus to affect his credibility. See *Commonwealth* v. *Min Sing*, 202 Mass. 121. It does not appear that the witness had any control over the movements of Mrs. Bradford, or that he was under any duty legal or moral to communicate what she had said to him, nor in-

---

\* The defendant was arrested by the New Bedford police and was examined by one Mason, the chief of police, and others.

deed whether the witness knew whether on the whole her testimony, if procured, would be favorable or unfavorable to the defendant. And indeed upon inspection of her testimony as it appears upon the record, it may well be argued that when taken in connection with other testimony in the case it is as favorable to the prosecution as to the defense. This act of the chief of police of itself falls far short of any tendency to show bias. Moreover the offer was rejected for the time being, in the then state of the evidence, without prejudice to the right to renew the offer if the evidence offered should " become competent later." It does not appear to have been renewed. There is nothing for the defendant in this exception.

The exception to the testimony of the witness Simmons that the defendant was the subject of a conversation between him and the witness Hart on the evening next following the finding of the body was rightly admitted. The government went quite close to the line but did not cross it.

Several other exceptions were taken with reference to the admission of evidence which have not been argued on the defendant's brief. Although they might be considered waived, yet in view of the grave nature of the crime charged they have been considered. None of them has any merit, and accordingly they are overruled.

4. At the close of the evidence the defendant presented a number of requests for rulings, some of which were given and some refused. So far as refused the defendant excepted.

The defendant stoutly insists that there was no evidence warranting a conviction upon either the second count which charged that murder was committed by choking and strangling, or the fourth which set out the manner as by suffocation. We have carefully read the evidence, including as well the testimony of the medical experts as the other material portions thereof. It would serve no useful purpose to recite it in detail. A careful analysis shows that it was ample to warrant a verdict of guilty upon either of the three counts. Hence the first, and a fortiori the fourth, requests were properly refused. The fifth, for reasons too obvious to mention, could not have been given as matter of law; and the same may be said of the ninth. The tenth was sufficiently covered by the charge, as was the thirteenth so far

as the defendant was entitled to it.   The exceptions to the refusal to give these requests must be overruled.

5. At the close of the charge the defendant took some exceptions to it.  In his brief, however, he has touched upon only two or three of these.   He complains that the instructions as to motive, as to the Sturtevant letters, and as to the evidential force of much of the testimony admitted to show the relations of the defendant to his wife and to the witness Sturtevant were insufficient and inaccurate.   None of these exceptions to the charge is tenable.   A reading of the charge shows that it was judicial in tone and fair in its allusions to the testimony, clear and correct in its exposition of the legal principles involved and their application to the varying possible views of the evidence. In a word, it was apt, full and clear.   No one of the exceptions to it is tenable.

*Exceptions overruled.*