347 P.2d 320

STATE of New Mexico, Defendant-in-Error,

v.

Frederick Douglas BROWN, Plaintiff-in-
Error.

No. 6515.

Supreme Court of New Mexico.

Dec. 2, 1959.

J. H. Burttram, Santa Fe, for plaintiff in error.

Frank B. Zinn, Atty. Gen., Hilton A. Dickson, Jr., Asst. Atty. Gen., Paul P. Shwartz, Sp. Asst. Atty. Gen., for defendant in error.

LUJAN, Chief Justice.

The defendant was convicted of assault and robbery while armed with a dangerous weapon and sentenced to a penitentiary term of not less than three and not more than twenty-five years, and to pay the costs of prosecution. In this proceeding he urges the reversal of his conviction on the grounds that there was no proof of the corpus delicti; that the verdict is not supported by substantial evidence and is contrary to the evidence presented; that the story of the complaining witness, Herman Ellison, was so highly improbable as to warrant removal of the case from the consideration of the jury; and that prejudicial error was committed by the court in refusing to give certain requested instructions and by certain of its rulings on the admissibility of evidence.

The complaining witness testified as follows: About 11:30 p.m., on June 12, 1958, he was awakened in his bedroom; the light .n the room had been turned on and the defendant, whom Ellison recognized, was there with a sock over his head, holding a white handled .22 caliber pistol which he moved in a rotary direction. He said to Ellison, "Hold up." Then defendant began shooting at the window panes. Ellison did not know how many shots were fired. Defendant then demanded that Ellison, "get the money." Ellison got out of his bed and gave the defendant a billfold containing between $40 and $50. Ellison told the defendant to get out. The defendant shook his shoulder, held the gun up and mumbled something. Ellison again told defendant to get out. Defendant then hit Ellison over the head with the gun. Ellison grabbed defendant's arm, got hold of the gun, took the sock off defendant's head and put defendant out the door of the house. Ellison did not hear the noise of a car driving away. Being fearful that the defendant might still be in the vicinity of

his house, Ellison turned out the lights, bathed his head and stayed awake until dawn when he looked outside the house and saw that no one was there. He then slept for a time and upon awaking went to call the sheriff from the home of his neighbor, Glenn Bost, which was located about four and a half miles distant from Ellison's house. Ellison arrived there about 9:00 o'clock in the morning.

The manner in which the defendant, a Negro who was the minister of a Baptist church in Tucumcari, became acquainted with Ellison and the events of the afternoon and evening preceding the robbery were dwelt upon considerably at the trial. The testimony and circumstances related to its weight and credibility are concisely and accurately summarized in the defendant's brief in chief as follows:

"On June 11, 1958, defendant went to the vicinity of the Cu-Quay Bar north of Melrose, N. M. to see a Mr. Strappy Robinson about leasing some horses from him to start a riding club for the young people of his church. He made all the arrangements for the horses, except the payment, and he returned on June 12, 1958, to meet Robinson at the Cu-Quay Bar to make payment.

"At the Cu-Quay Bar the defendant met Pierce Christensen and the complaining witness, Herman Ellison. The stories of these three individuals vary considerably concerning what happened after this time.

"According to Christensen, a witness for the State, he was there first and defendant arrived about an hour afterward. During this hour (Christensen) consumed two or three cans of beer. The complaining witness, Ellison, arrived at an unknown time in the afternoon. However, they were all there several hours together and it was dark when they left. During that time Christensen admits that he drank two or three more cans of beer, he 'imagines' defendant drank two cans of beer and he says Ellison was drinking beer, but didn't guess how much. He admits that he was intoxicated, but says he wasn't drunk. He also says Ellison was intoxicated, but not drunk. Ellison had recently lost his driver's license because of a conviction of driving while intoxicated. Oddly, Christensen did not see Ellison come to the bar or leave on the day in question, and didn't know his mode of transportation. He and defendant left together in defendant's car to go to Ellison's house. Christensen stated that he had been driving Ellison around to sharpen discs and ploughs and he went with Brown to see (Ellison) about more work. After they arrived at Ellison's they all talked and drank some more beer, and

then Brown wanted to shoot dice. He said Brown threw some dice on the floor, but he didn't know where they came from, and he told defendant that he didn't want to shoot dice but picked up the dice and stuck them in his pocket. He was unable to identify two dice presented as the dice which he had picked off the floor at Ellison's house. They sat outside part of the time and Ellison and the Defendant went into the house for a few minutes by themselves. Christensen and defendant left Ellison's house together around 8:30 p.m. They returned to the Cu-Quay Bar, stayed a few minutes and Christensen got in his car and went home.

"The defendant Brown's testimony of the events on June 12th coincide very closely with the story of Christensen concerning the amount of beer consumed and state of intoxication of Christensen, Ellison, and Brown—prior to the time they arrived at Ellison's house. However, the defendant claimed that Ellison produced the dice. Also, defendant claimed that an altercation occurred between him and Ellison when Christensen was outside the house, that Ellison tore his shirt collar, and that defendant hit Ellison with the .22 caliber pistol (belonging to the defendant) which they had been using for target practice. Defendant stated that he and Christensen returned to the Cu-Quay Bar, that they both left a little later, and that he arrived home in Tucumcari between 10:00 and 10:30 p.m.

"Ellison tells a very different story. He claims that he was in the Cu-Quay Bar with Glenn Bost for about five minutes on June 12, 1958 while the defendant was there, and that Glenn Bost took him home around the middle of the afternoon. He admitted drinking only one can of beer at the bar and one by himself at home. He denied that the three of them drank beer together at the Cu-Quay Bar and even denied talking to the defendant during the hour or so that defendant and Christensen were at his home. He further denied that Christensen had driven him around to sharpen discs. He also denied that he and Brown were in the house alone for a time when Christensen went outside. He claims that defendant and Christensen left between 8:00 and 9:00 p.m. and that he immediately went to bed and went to sleep, wearing only the khaki shirt he had worn that day.

"The only three witnesses to the events of the evening all had prior criminal convictions. Defendant Brown admitted a prior conviction for burglary in 1947 and for possession of a deadly weapon on September 27, 1957, according to a criminal record in the

possession of the District Attorney. Pierce Christensen admitted a prior conviction of a felony or a misdemeanor, without further explanation. Herman Ellison admitted a recent conviction for driving while intoxicated, with revocation of his driver's license, and was not questioned concerning other convictions."

Glenn Bost testified as a witness for the defense that he paid Ellison the sum of $23.25 by check on the morning of June 12, 1958 and took him home by noon, but denied taking him home that afternoon.

The sheriff of Curry County, Newell Ramsey, together with B. E. West, then deputy sheriff of Quay County, arrested the defendant at his home in Tucumcari on June 14, 1958. The defendant gave these officers consent to search his home.

Upon the trial the state introduced in evidence the following exhibits: a silk stocking found on the floor of Ellison's house near the entrance to Ellison's bedroom; a .22 caliber, nine-shot pistol and some boxes of shells of .22 and .25 caliber, found by the arresting officers in the top drawer of a dresser in defendant's home; a billfold belonging to the complaining witness which he found on the ground some fifty yards west of his house several days after the robbery; two red dice; a billfold belonging to the defendant; and several articles of blood-stained clothing which Ellison and the defendant wore on the day in question.

It is our opinion that the corpus delicti was adequately established; that the verdict of the jury conformed to the evidence and was supported by substantial evidence; and that the instructions given the jury adequately covered the defendant's case.

■ It is objected that the court erred in receiving in evidence two red dice, on the ground that they were not sufficiently identified and were not relevant, since the robbery occurred several hours after the participants had anything to do with any dice. The point is without merit. Christensen testified the dice looked just like the dice he had taken from the defendant at Ellison's house. He stated he put the dice in his pocket at the time and later gave them to Sheriff West. Sheriff West identified the exhibit as the dice Christensen had given him. No objection was made at the trial on the ground of lack of relevance of the exhibit; but if the dice were irrelevant, they tended to support the defendant's case and were not prejudicial to it.

■ A substantial challenge is made to the validity of the proceedings with respect to testimony given by Sheriffs Ramsey and West about their discovery of a detective magazine in defendant's home.

Sheriff Ramsey testified as follows:

"Q. Do you know anything about a magazine which was found in the defendant's house that day (the day of

his arrest)? A. At the time we were searching for this, we were searching for another gun and Mr. West called my attention to a detective story magazine and pictures in the magazine.

"Q. Did you see that magazine sir? A. I did sir.

"Q. That was on the 14th? A. Yes, sir.

"Q. On that day, was that the same day that Sheriff West and myself came over there? A. Yes sir.

"Q. Now, what did you see in this magazine?

"Mr. Buzzard (The trial counsel for defendant): It is objected to, this line of questions is objectionable because it it not material nor relevant.

"Mr. Nieves: I believe that if I am permitted I can connect it to the issues in this case.

"The Court: Proceed, Overruled.

"Q. Strike that question. Sheriff, when you first saw that magazine on June the 14th was it open or closed? A. It was opened.

"Q. Did you see what was apparent to the eye at the place it was opened, what the story was about? A. Yes, sir.

"Q. What did you see, Sheriff? A. It was called 'The Hooded Robber' or something of that kind, there was a picture of a robber there with a sock, the title had something to do with a sock.

"Q. It was a picture of the robber in this magazine? A. Yes sir.

"Q. Would you describe the picture of the robber? A. I believe it was just a picture of the robber with a sock over his head, that is the way I remember it, I don't remember too much about the picture.

"Q. Do you know what became of that magazine Sheriff? A. No, sir, I don't.

"Q. Did you ever make effort to find that magazine? A. We did.

"Q. Just where was the magazine located in the house of the defendant? A. I don't recall just where it was because sheriff Briscoe West had the magazine in his hand when I first noticed it and he called my attention to it, he called me over there wanting me to look at that picture.

"Q. Did you later go back to see if you could find that magazine? A. Yes sir.

"Q. Were you able to locate it? A. No sir."

Sheriff West testified as follows:

"Q. In searching the house did you come across any periodical or magazine? A. Yes, I did.

"Q. Where did you find this magazine and what type magazine was it? A. It was some sort of detective magazine, something like 'Official Detective' magazine.

"Q. Where was it? A. It was laying on a little dresser type thing beside the bed, the best I remember.

"Q. Was the magazine open or closed? A. It was open.

"Q. Do you recall what was apparent to the sight at the place where the magazine was open? A. Yes, this magazine was open and turned back to a story and it was titled 'The Skull Cap Robber,' or something about a robber.

"Mr. Buzzard: Your Honor, I object to this line of testimony again, it is not connected with the defendant and it has not been—the previous attempt did not show the defendant had read it, I think it is prejudicial and I move that it be stricken from the record and withdrawn from the jury.

"The Court: Overruled.

"Mr. Buzzard: Exception.

"Q. Was there a picture in connection with the story in the magazine? A. Yes, sir, there was.

"Q. What type picture? A. There was a picture of a fellow with a silk stocking pulled partially over his head.

"Q. Did you take possession of that magazine? A. Yes, I did at that time.

"Q. Did you show it to anyone? A. I am sure I did.

"Q. Who did you show it to? A. I think I showed it to you and one of the officers from Tucumcari.

"Q. Did you keep the magazine Sheriff West? A. No, I didn't. That was my intention but I forgot it and left it there.

"Q. Did you afterwards make an attempt to retrieve the magazine? A. Yes, I did.

"Q. Were you able to locate it? A. No, I sent the Sheriff from Tucumcari and the Deputy back out there to see if they could find it and they advised us later that they couldn't find the magazine."

The defendant testified:

"Q. There has been some reference to a detective magazine. Do you read detective magazines Fred? A. No, sir, I don't, but I imagine that in pastoring a church you will find that children usually come to the Pastor's house and they usually bring their school books and what not and leave those things there. I have never purchased any detective magazines. I have heard references made to one but I know nothing of it."

The argument of the defendant is that there was no evidence connecting the magazine story with the defendant and no evidence that the magazine had any connection with the crime charged. He contends that the testimony, considered in connection with the highly improbable testimony of the complaining witness, was prejudicial to him.

In support of the court's ruling the state places its principle reliance on State v. Pruett, 22 N.M. 223, 160 P. 362, L.R.A. 1918A, 656. In that case, a prosecution for first degree murder where the state sought to establish homicide by lying in wait, we approved the use of testimony by state witnesses that they saw knee-prints adjacent to a cedar bush near the scene of the crime. We applied the rule that any person may express an opinion before a jury upon a non-technical subject, based upon data which he has observed when it is impossible by word of mouth or gesture to reproduce the data before the jury, in order that the jury may draw the inference therefrom which the witness has drawn. That ruling went to the competence of the testimony rather than to its materiality or relevance, which were not challenged.

Section 116, Underhill's Criminal Evidence (5th Ed., 1956) p. 207, states:

"* * * it is permissible to put into evidence physical objects which are part of the res gestae, or illustrate the crime or the transaction on which the indictment is based. In this class are burglary tools, fruits of crimes such as larceny or robbery * * * drawings, maps, charts, forms and other memoranda kept by defendant. * * *"

Section 238, II Wigmore on Evidence (3rd Ed., 1940) p. 35, states:

"* * * Where a person makes inquiries, either by word of mouth or by messenger, or by experimentation searches for knowledge, it is natural to infer that he designs to use the knowledge thus sought; and if the knowledge is needed or is adapted to help in doing the act in question, the inquiries or experiments are thus evidential of a design to do the act. * * *"

In Sanders v. U. S., 10 Cir., 1956, 238 F.2d 145, 147, on a charge of bank robbery, the prosecution introduced in evidence some gas masks and some manuals on safe-cracking procedures. These items had been secreted in the residence of one of the defendants and were discovered by the arresting officers. The manuals contained a discussion of the means of opening safes, noted that some safes were equipped with gas which was dispersed when they were opened, and described methods of neutralizing the gas. During the trial the manuals were withdrawn from the consideration of the jury, but the gas masks remained in evidence. It was objected that the acceptance of the gas masks in evidence was reversible error and point was made there was nothing to indicate they had ever been used.

The court held that the gas masks were properly received as exhibits and that both the manuals and the gas masks came within the familiar principle which allows admission of burglar's tools when they are found in the possession of the defendant soon after the time of the commission of the crime. The court said:

"The possession of the manuals and gas masks constituted a circumstance indicating that the defendants had sought guiding information respecting techniques, methods, and means of opening a safe and had immediately at hand instrumentalities appropriate for protecting themselves against the effects of tear gas while engaged in the opening of a safe."

In Commonwealth v. Howard, 1910, 205 Mass. 128, 91 N.E. 397, 404, the defendant was charged with the murder of his wife by strangling her. He was a soldier and there was found in his room a soldier's handbook dealing with modes of causing death. Its admission in evidence was held proper under the circumstances detailed by the court:

"The soldier's handbook containing instructions and diagrams, among which were instructions for the compression of the carotid artery, was properly admitted. It was the book of the defendant and the leaf at that place was turned down, and it may fairly be inferred that he had studied that part of the book with some care. He had also received oral instructions on the same subject. From the absence of any marks of violence upon the throat at the time the body was found, it might have been argued in behalf of the defendant that it would be impossible for him, apparently an illiterate man and having no other common knowledge of the throat, to have done the deed by violence without leaving any mark. To meet this argument it was competent to show that he had been studying the matter. And this would be so even if, as claimed by the defendant, there was no evidence that death was caused by compression of the carotid artery. The manner in which the evidence tended to show that death occurred is nearly enough allied to the compression of the artery."

The requirements for the introduction of the exhibits used in these cases are (1) that the book or document be clearly related to the defendant and (2) that it be of a character which is demonstrative of his preparations for or of the means used to commit a crime. We believe a sufficient connection between the magazine and the defendant was established in this case, but the character of the magazine story in question may or may not have been demonstrative of his preparations for or the means used to commit a crime. Neither of the witnesses read

the story. Had they done so, the magazine itself being unavailable, the court could properly have heard the state's tender of proof to determine this issue. The case being otherwise, it was prejudicial error to allow the jury to infer the character of the story and on the basis of that inference to infer the use the defendant might have made of it.

The case is reversed and remanded for a new trial. It is so ordered.

CARMODY and MOISE, JJ., concur.

McGHEE and COMPTON, JJ., dissenting in part.

McGHEE, Justice (dissenting in part).

I concur in all of the opinion circulated by the Chief Justice except the holding that the case should be reversed because the jurors might have indulged in improper speculation as to the contents of the magazine article to the prejudice of the defendant. It seems to me this statement is itself based on speculation.

At the top of page 9 of the proposed opinion a quotation from Section 238, II Wigmore on Evidence, 3d Ed., 1940, p. 5 reads as follows:

"* * * Where a person makes inquiries, either by word of mouth or by messenger, or by experimentation searches for knowledge, it is natural to infer that he designs to use the knowledge thus sought; and if the knowledge is needed or is adapted to help in doing the act in question, the inquiries or experiments are thus evidential of a design to do the act. * * *"

In the second paragraph of this same section we find:

"Most evidence of this sort needs no judicial ruling to determine its relevancy, and the precedents deal with only a limited number of the possible uses of such evidence. The discretion of the trial Court should control in all these cases; it is impossible to lay down any general rule that will be definite enough to serve as a solution for each instance; and it is poor policy to attempt in a Supreme Court to pass upon the probative value of each given piece of conduct."

I fully agree with the statement that there was sufficient proof to tie the magazine article and the defendant together.

The substance of the testimony of Sheriff West as to the magazine article is that it was laying on a little dresser type thing beside the bed of the defendant; that it was open and turned back to a story entitled "The Skull Cap Robber" or something about a robber; that he showed the article to the Assistant District Attorney and one of the officers from Tucumcari; that he forgot the magazine and left it in the appellant's

home, and later telephoned to the officers at Tucumcari to get it but they did not find it.

There seems to be a scarcity of authority on the subject but I believe the cited section of Wigmore favors the state. Bear in mind the fact that the prosecuting witness testified the defendant had a stocking pulled over part of his face when the holdup occurred and that he, the witness, jerked it off.

I believe the testimony was admissible and file this partial dissent.

COMPTON, J., concurs.