COMMONWEALTH *vs.* JOHN M. BURKE.

Suffolk.    May 4, 1959. — July 3, 1959.

Present: WILKINS, C.J., RONAN, SPALDING, COUNIHAN, &
WHITTEMORE, JJ.

*Manslaughter.    Pleading, Criminal,* Bill of particulars.    *Evidence,* Of
identity, Competency, Admissions and confessions, Consciousness of
guilt, Of state of mind, Relevancy and materiality, Res gestae.    *Prac-
tice, Criminal,* Exceptions: whether error harmful.    *Error,* Whether
error harmful.    *Constitutional Law,* Self incrimination.

Certain particulars furnished by the Commonwealth in connection with
an indictment for assaulting and bringing about the death of a woman
were not so indefinite in stating the place and means of the assault as
to invalidate the indictment when read with the particulars, nor was
there abuse of discretion in not ordering further particulars.  [523]
Evidence at the trial of an indictment as to the nature and extent of in-
juries, including a fatal fracture of the skull and brain lacerations,
suffered by a woman found lying unconscious at the side of a street
one evening after she and her husband, the defendant, had driven
away in an automobile from a party which they had been attending,
together with other evidence, mostly circumstantial, warranted find-
ings that they had quarreled that evening, that he had assaulted her
and caused such injuries and had left her where she was found, and
that he was guilty of manslaughter, rather than that she got out of the
automobile to go to the house of a relative and the defendant proceeded
on his way in the automobile to report at his place of work and that
thereafter she either had been struck by some automobile or had
fallen on the pavement and sustained her head injuries by reason of
being intoxicated.  [524–531]
It was reversible error at a criminal trial to admit testimony of a police
officer that before the defendant's arrest for the alleged crime he, the
officer, had told the defendant he wished to talk to him and the de-
fendant had replied that he would not talk to "any . . . police
official" "because . . . [he had] engaged a lawyer"; that the next
day there was an interrogation of the defendant by the police officer
at the outset of which the defendant stated that he had engaged coun-
sel and would not answer any questions and throughout which the
defendant refused to answer all questions, saying that counsel had ad-
vised him not to;  and that on such occasions the police officer had asked
the defendant why had he engaged counsel if he had nothing "to hide"
or "worry about."  [531–533]

At a criminal trial for causing the death of the defendant's wife, evidence showing merely that the defendant and another woman had occupied an apartment for a short time nearly seven months before the wife's death was too remote on the issue of hostility of the defendant toward his wife and should have been excluded. [533–534]

At a criminal trial where it could have been found that the defendant assaulted his wife and caused her fatal injuries and left her unconscious at the side of a street, and that shortly before she was found there she had been lying in the gutter near the defendant's automobile on another street and had been assisted by him to her feet in a dishevelled condition, testimony by an eyewitness of the earlier occurrence that she had said to the witness as he approached her, "Arrest him, arrest him," was admissible as a part of the res gestae. [534]

There was at a criminal trial no violation of the defendant's constitutional privilege against self incrimination in that in the court room he was compelled to assume a position of looking backward over his shoulder like the position at a material time of one whom the Commonwealth sought to identify as the defendant. [534–535]

At a criminal trial where the Commonwealth claimed that the defendant assaulted his wife and caused fatal injuries, testimony by a police chemist that he had found a bloodstain on the seat of an automobile in which the defendant and his wife had been riding shortly before she was found injured and unconscious at the side of a street, but that the witness was unable to determine whether the blood was human or animal or how long the stain had been there, should have been excluded as irrelevant. [535]

INDICTMENT found and returned on November 19, 1957.

The case was tried in the Superior Court before *Dewing*, J.

*Thomas E. Dwyer*, (*John J. White* with him,) for the defendant.

*Angelo Morello*, Assistant District Attorney, for the Commonwealth.

SPALDING, J. Marie F. Burke and the defendant were husband and wife. Shortly before eleven o'clock on the night of Saturday, September 28, 1957, Mrs. Burke was found lying unconscious on Broadsound Avenue in Revere near the northwesterly corner of Broadsound and Nerious avenues. She died twenty-seven hours later at the Massachusetts General Hospital. Death was caused by a fractured skull and lacerations of the brain. Subsequently the defendant was accused of causing her death in an indictment charging murder in the second degree. Having been found guilty of manslaughter, he brings the case here by appeal

with numerous assignments of error.  G. L. c. 278, §§ 33A–33G.

1.  The defendant asserts that the judge erred in denying his motions to strike two of the Commonwealth's answers to his motion for particulars (assignment 57).  The answers, which related to the place of assault and the instrument used in the assault, were as follows:

"The assault was committed in the city of Revere . . . on American Legion Highway or Broadsound Avenue or Nerious Avenue or on all of said streets, avenues or highways or in the vicinity or surrounding area of said streets, avenues or highways.  The Commonwealth is unable to specify more fully at this time."

"The Commonwealth specifies that Marie T. Burke came to her death because of an assault upon her by the defendant by the use of his hands or feet or by the use of both his hands and feet or by the use of a weapon or other instrumentality alone or in conjunction with the use of his hands or feet or both.  A true description of said weapon or other instrumentality being unknown to the Commonwealth at this time."

The matter of further particulars was within the discretion of the trial judge.  *Commonwealth* v. *Mercier*, 257 Mass. 353, 364.  *Commonwealth* v. *Bartolini*, 299 Mass. 503, 509.  There was no abuse of discretion.  "All that is required is that the indictment, read with the bill of particulars, be sufficient fully, plainly, substantially and formally to give the defendant reasonable knowledge of the crime with which he is charged."  *Commonwealth* v. *Hayes*, 311 Mass. 21, 25.  The Commonwealth was required to state the charge with as much certainty as the known circumstances would permit.  *Commonwealth* v. *Howard*, 205 Mass. 128, 145.  It has not been shown that circumstances known to the Commonwealth would have permitted fuller and more precise descriptions than those given.  We are of opinion that the indictment read with the particulars was not invalid for indefiniteness.  See *Commonwealth* v. *Howard, supra,* pages 141–145.

2. At the close of the evidence the defendant filed separate motions for a directed verdict of not guilty to so much of the indictment as charged (1) murder in the second degree, (2) manslaughter, and (3) assault and battery. In view of the verdict we need consider only the second motion. Inasmuch as there are numerous exceptions to rulings on evidence, some of which were erroneous, we shall consider only such evidence as was admissible.

The jury could have found these facts. On the afternoon of September 28, 1957, the defendant and his wife attended a wedding reception at a club in Nahant. There they were observed dancing together and each had several drinks of liquor. After the reception, which ended about five o'clock, the Burkes, together with a group of wedding guests, went to the home of one Finn in Saugus, where a party was held. Mrs. Burke, according to one witness, consumed four or five drinks of straight whiskey. Food was served but Mrs. Burke was not seen eating any of it. About 10 P.M. the defendant told Finn that he had to go into Boston to report for work and that he was going to leave his wife at the house of his father-in-law at 8 Nerious Avenue in Revere. The Burkes left the Finn home in his automobile shortly after ten o'clock. Burke's automobile was a 1956 Pontiac coupe, two-tone gray in color. Its registration number was P76049. The front license plate was bent. Mrs. Burke was wearing a sheer red dress.

About 10:30 that night John Duplin and Patricia Mayberry were driving south on the American Legion Highway in Revere. They observed a Pontiac automobile parked at the side of the road and a woman lying in the gutter near it. Duplin parked his automobile about three feet in front of the Pontiac. As Duplin was leaving his automobile to reach the woman, he saw a man leave the driver's seat of the Pontiac, assist the woman to her feet, and return to his seat. Duplin approached the woman who was then standing on the curb with her hands up to her face. Her hair was mussed and out of place and her red dress was twisted. As Duplin came up to her she said: "Arrest him, arrest him."

She spoke in a "crying . . . pleading voice." Duplin then went to the Pontiac and spoke to the man in it, who said: "Get going, just take off, leave us alone." Duplin then returned to his automobile, noticing, as he proceeded, that the front license plate of the Pontiac was bent. Upon instructions from Duplin Miss Mayberry obtained the license number of the Pontiac. The woman got into the Pontiac unassisted and the man and woman then drove off. Duplin and Miss Mayberry identified the man and woman as the defendant and his wife, and the Pontiac coupe as the one belonging to Burke.

Shortly before eleven o'clock that night Arnold Kline and Irma Wolinski were sitting in Kline's automobile, which was parked on Broadsound Avenue in Revere. Looking through the rear window, Miss Wolinski saw a man standing over an object in the street near the corner of Broadsound and Nerious avenues. Kline backed his automobile toward the corner while Miss Wolinski continued to observe the scene. The man began to walk away, looking over his shoulder as he did so. Kline stopped the automobile and got out. The man continued to walk away from the scene until he came to a parked Pontiac automobile, which he entered and drove away without turning on the lights. The object in the street was Mrs. Burke. She was lying unconscious, with her head toward the middle of the street and her feet about two feet from the curbstone. Her legs were close together; one of her arms was by her side and her other arm holding her handbag over her stomach. Both of her shoes were intact and in place. The hem of her dress was down over her knees and the skirt of the light coat she was wearing was spread neatly beneath her body. Her dress in the region of her stomach was torn and her midriff was bare. One of her eyes was blackened.

Kline and Miss Wolinski had been sitting in Kline's parked automobile on Broadsound Avenue since about 10:40 P.M. Between that time and the time they saw the man standing over Mrs. Burke they neither saw nor heard anything unusual with respect to the traffic. Police officers

Bittner and Robson arrived at the scene shortly after 11 P.M. as Mrs. Burke was being placed in an ambulance. Officer Robson investigated for signs of a traffic accident. He found no marks on the highway, no blood, no pieces of glass, no dirt and no particles of clothing.

Kline and Miss Wolinski could not identify the defendant as the man they saw on Broadsound Avenue, but they stated that the defendant resembled him. They also stated that the Pontiac they saw at the scene resembled the one belonging to the defendant.

The defendant was a lieutenant in the Boston fire department at the time of his wife's death. On September 28, 1957, his place of duty was on Broadway. He was seen there for the first time that night around 11:20. A short time thereafter he received a telephone call and left for the Massachusetts General Hospital to which his wife had been brought. Upon arrival there he talked to a Dr. Zuidema who told him that the condition of his wife was serious and it was important, in order to determine the proper medical treatment, to know whether or not she had been hit by an automobile or assaulted. The doctor then asked him if he and his wife had quarreled that evening. The defendant replied, "Yes," and hung his head. One O'Brien, a police officer, came to the hospital to question the defendant and the defendant told him that he and his wife had attended a wedding reception at the Thomson Club in Nahant and that he left the club around 10:15 P.M. to drive his wife to her father's house in Revere. He stated that he made no stops between Nahant and Revere and left his wife near the corner of Broadsound and Nerious avenues at about 11 P.M. He said that she had been drinking quite a bit, but since he was in a hurry to get to work he did not take her into her father's house. The defendant stated that he was the only person who drove his automobile after six o'clock that night.

Mrs. Burke died at 2 A.M. on September 30, 1957. An autopsy, performed the same day, showed the following external signs of injury: a bruise, about four inches in diameter on the right lower quadrant of the abdomen (across

this bruise there was a band or scratching one inch in length); two black eyes, accompanied by swollen eyelids; bleeding under the skin of the calves of the legs, extending from near the ankles to near the back of the knees; multiple scrapes of the knuckles of both hands; bleeding under the skin on the back of the right shoulder, extending downward into the upper part of the right arm; a bruise on the upper part of the right buttock two inches in diameter; and a bruise on the left hip one inch in diameter. The autopsy further revealed that an extensive fracture of the back of the skull on the right and contusions and lacerations of the brain had caused death. It also appeared that the roof of each of the eye sockets was fractured, that there were two bruises on the small bowel, and that there was a contusion of the right psoas muscle.

Most of the evidence introduced by the Commonwealth was circumstantial. In discussing the probative character of circumstantial evidence this court, per Rugg, C.J., has said: ". . . the circumstances must be such as to produce a moral certainty of guilt, and to exclude any other reasonable hypothesis; '. . . the circumstances taken together should be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty, that the accused, and no one else, committed the offence charged.' *Commonwealth* v. *Webster*, 5 Cush. 295, 319." *Commonwealth* v. *Russ*, 232 Mass. 58, 68. See *Commonwealth* v. *O'Brien*, 305 Mass. 393; *Commonwealth* v. *Shea*, 324 Mass. 710. We proceed to an analysis of the evidence in the light of these principles.

The jury could reasonably infer that there was discord between the Burkes on the Saturday night in question. Burke admitted to Dr. Zuidema that they had been quarreling that evening. When Duplin approached Mrs. Burke on the American Legion Highway she said "Arrest him, arrest him." This statement (the admissibility of which will be discussed later) is evidence that she harbored some animosity toward the defendant at that time. It could also be inferred from her statement, her disheveled condition and

the fact that she was observed lying in the gutter that the defendant had assaulted her.

The jury could reasonably conclude that the defendant had ample, if not exclusive, opportunity to commit the crime charged. The defendant and his wife left the Finn home in Saugus alone in his automobile around 10:15 P.M. Duplin and Miss Mayberry placed them on the American Legion Highway in Revere alone at about 10:30 P.M. The defendant admitted to Sergeant O'Brien that he left his wife at the corner of Broadsound and Nerious avenues around 11 P.M. Kline and Miss Wolinski noticed the body in the street and the man standing over it at 10:55 P.M. The defendant was not seen at his place of work in Boston until 11:20 P.M. at the earliest. The jury took two views, at which the time required to drive between the various locations was checked. The jury could consider the information gained in this manner on the question of opportunity.

The jury could reasonably find that the defendant was at the corner of Broadsound and Nerious avenues at the time his unconscious wife was discovered by Kline and Miss Wolinski. Kline and Miss Wolinski testified that the man they saw standing over the body resembled the defendant and that the Pontiac automobile the man used resembled the automobile of the defendant. Of course, testimony of resemblance falls short of a positive identification. Nevertheless, such testimony was admissible. *Commonwealth* v. *Galvin*, 323 Mass. 205, 214–215, and cases cited. Any uncertainty in the identification affects the weight, but not the competency of the testimony. *Commonwealth* v. *Turner*, 224 Mass. 229, 237. The jury could consider the testimony of resemblance, together with the defendant's admission that he left his wife at 11 P.M. and the evidence of the relative times and distances, and legitimately infer that the man standing over the body of Mrs. Burke at 10:55 P.M. was the defendant.

The defendant argues in substance that the case proved by the Commonwealth was as consistent with the defendant's innocence as with his guilt. It is, of course, true that when the "evidence tends equally to sustain either of two incon-

sistent propositions, neither of them can be said to have been established by legitimate proof." *Commonwealth* v. *Carter*, 306 Mass. 141, 147. *Commonwealth* v. *O'Brien*, 305 Mass. 393, 399–401, and cases cited. The defendant's argument is grounded upon testimony elicited from Dr. Ford, the medical examiner who performed the autopsy and was conceded by the defendant to be a "preëminently qualified" expert in forensic pathology. Dr. Ford testified on direct examination that in his opinion "there are no injuries in this death that fit with the usual automobile pedestrian contact." On cross-examination he testified that he had seen cases where there were automobile-pedestrian contacts causing injuries which did not indicate they had been received as the result of such an accident. He also testified on cross-examination that the head injuries which were the cause of death could have resulted from a fall by a drunken woman onto the pavement.

A jury could reject the hypothesis that Mrs. Burke's death was caused by a traffic accident as an unreasonable one. Dr. Ford's testimony dealt only with a possibility. Duplin saw Mrs. Burke get into the Pontiac without assistance on the American Legion Highway at about 10:30 P.M. She was found unconscious at Broadsound and Nerious avenues at 10:55 P.M. The defendant stated that he left Mrs. Burke there at around 11 P.M. Kline and Miss Wolinski had been parked near the corner since 10:40 P.M. and they neither saw nor heard anything indicating that a traffic accident had taken place. Officer Robson investigated for signs of a traffic accident immediately after the body of Mrs. Burke was discovered and found none. Mrs. Burke's limbs were arranged in an orderly position when she was found, her clothes were neatly arranged and her shoes were intact. The jury could infer that one who had been hit by an automobile would not have been found in such a condition. This combination of circumstances could produce a moral certainty in the minds of the jury that the death of Mrs. Burke was not the result of a traffic accident.

The rejection of the hypothesis that her death was caused by a drunken fall after the defendant left her at Broadsound and Nerious avenues presents greater difficulty. There was evidence that Mrs. Burke had been drinking both at the wedding reception and at the Finn home. However, although there was testimony that Mrs. Burke was "feeling pretty good" when she left the Finn home, there is nothing in the record to indicate that she was unable to walk properly. When Duplin and Miss Mayberry saw her on the American Legion Highway at 10:30 P.M. she was able to get into the automobile unassisted. It might be inferred from the fact that Mrs. Burke was found with multiple bruises, abrasions and fractures on both the anterior and posterior surfaces of her body that she could not have received such extensive injuries as the result of a drunken fall onto the pavement.

We think that it was open to the jury to find that Mrs. Burke did not die as a result of a drunken fall. This conclusion is strengthened by the testimony of Dr. Ford that the bruise on the lower right quadrant of Mrs. Burke's abdomen was the result of a violent impact by a small striking surface. He testified that based upon his experience this type of injury is "consistent with a kick." His opinion was that Mrs. Burke was probably upright when she received the blow to her abdomen. In answer to a hypothetical question Dr. Ford stated that a blow of the character and severity of the one which caused the bruise inflicted on a standing woman would cause a backward fall, and a backward fall onto pavement is consistent with a fractured skull. It cannot be doubted that testimony of this character is not evidence that death occurred in the manner suggested by the questions. *Commonwealth* v. *Polian,* 288 Mass. 494, 501, and cases cited. But, "[e]vidence tending to show that there was nothing in the conditions disclosed at the autopsy inconsistent with the theory of the case based upon the other testimony offered by the Commonwealth . . . [is] competent." *Commonwealth* v. *Cantor,* 253 Mass. 509, 513. See *Commonwealth* v. *Donoghue,* 266 Mass. 391, 396–397, and cases cited. The "other testimony" can be entirely cir-

cumstantial. *Commonwealth* v. *Donoghue, supra.* A jury could consider testimony of this character in excluding a hypothesis as to how death was caused.

We are of opinion that the judge did not err in denying the defendant's motion for a directed verdict of not guilty.

3. One Reardon, a police officer, was allowed to state, over the defendant's objections,[1] two conversations he had with the defendant prior to the defendant's arrest (assignments 26 and 27). The first was a telephone conversation on the afternoon of Sunday, September 29, 1957. The witness testified as follows: "I asked him that I would like to talk to him to clear up some matters relative to this incident, and the defendant informed me over the phone, 'I don't want to talk to you or any other police official regarding this matter. I have already engaged a lawyer.' I asked the defendant why he had engaged a lawyer if there was nothing he had to hide. . . . I told him I would come to his son's home if he was afraid to come to the station . . . . He said, 'I am talking to you or no other police official because I have engaged a lawyer.' " The defendant moved to strike this testimony but the motion was denied subject to his exception.

The second conversation took place the next day at the home of the defendant's son. Officer Reardon testified that at the outset the defendant informed him that he refused to answer any questions and that he had engaged counsel. For approximately half an hour the police asked questions. This pattern emerged: "How old are you, Mr. Burke?" "I refuse to answer." "How long have you been married?" "I refuse to answer. My lawyer told me not to say nothing. . . ." Similar answers were given by the defendant to numerous other questions, all of which were objected to. In the course of Reardon's testimony he was permitted to state, over the defendant's objection, that "I asked him why he had en-

---

[1] At the inception of both lines of interrogation the defendant stated to the judge, in bench conferences, the expected answers of the witness (which proved to be correct) and argued that the evidence was inadmissible. The judge, nevertheless, in each instance permitted the line of inquiry to be pursued.

gaged a counsel if he had nothing to worry about." The defendant moved to strike Reardon's testimony, and excepted to the denial of his motion.

Testimony that a criminal defendant (not under arrest) remained silent when an accusation against him was made in his presence is competent as an implied admission if it be shown that he heard and understood the accusation and if the accusation concerned matters within his knowledge which it would have been natural for him to deny. See *Commonwealth* v. *Kenney*, 12 Met. 235, 237; *Commonwealth* v. *Boris*, 317 Mass. 309, 317–318. Testimony that a defendant made evasive or equivocal replies to accusations heard and understood by him is also admissible. See *Commonwealth* v. *Trefethen*, 157 Mass. 180, 197–198; *Commonwealth* v. *Valcourt*, 333 Mass. 706, 716. See generally, Maguire, Adoptive Admissions in Massachusetts, 14 Mass. L. Q. (No. 6) 62. Nevertheless, the defendant's objections to the admission of Officer Reardon's testimony must be sustained.

This point is governed by the principles recently enunciated by this court in *Commonwealth* v. *Sazama, ante,* 154. There it was said at pp. 157–158, that "A man, being interrogated under circumstances which reveal that he is suspected of crime, even if not under arrest, certainly may properly assert his constitutional right to consult counsel and may refuse, on the advice of counsel or otherwise, to make statements. See art. 12 of the Declaration of Rights of the Constitution of Massachusetts. He may reasonably fear (without any consciousness of guilt whatsoever) that anything he says will be distorted, misquoted, or used as the basis of argument unfairly. . . . A refusal to talk in the absence of counsel, or upon the advice of counsel, is neither a complete denial of a statement . . . nor absolute silence. It, however, also is not an admission or adoption of the statement but an attempt to assert a constitutional right, which negates any inference of an admission. Such assertions by criminal defendants during police interrogations are not competent testimony against such defendants."

Reardon's testimony was even more objectionable than

the testimony considered in the *Sazama* case. It did not include any question to the defendant that could be treated as an adoptive admission until the end of the second conversation. The only conceivable reason for the introduction of most of it (as the prosecutor's argument to the jury makes clear) was to show consciousness of guilt on the part of the defendant because he had refused to talk on advice of counsel. The right to the advice of counsel would be of little value if the price for its exercise is the risk of an inference of guilt. This testimony should have been excluded.

The defendant carefully preserved his rights at every stage during the reception of the testimony. The testimony, unlike that in the *Sazama* case, was not merely cumulative. We therefore cannot say that its erroneous admission did not prejudice the rights of the defendant. It follows that there must be a new trial.

4. There are many other assignments of error but we shall discuss only such of them as are likely to arise in a subsequent trial and are of sufficient importance to merit discussion.

The defendant argues that the court erred in admitting the testimony of the witnesses Reardon, DeGiso, Cotter, Newcomb and Devine and exhibits consisting of an electrical service bill, a rental application and a notice to vacate an apartment (assignments 28, 35, 38, 55). This evidence tended to prove that the defendant and a woman had occupied an apartment in Roxbury for a two week period in February and March of 1957, and that their tenancy was terminated because Mrs. Burke came to their landlord and informed him that this woman was not the defendant's wife.

Evidence that one accused of killing his wife has formed an attachment for another woman may form the basis of an inference that the accused entertained feelings of hostility toward his wife. *Commonwealth* v. *Bonomi*, 335 Mass. 327, 355. But since evidence of this character tends to prove the commission of other crimes, "[c]are . . . should be exercised not to resort to proof of circumstances too remote

in time or cause." *Commonwealth* v. *Howard,* 205 Mass. 128, 148.

The incident revealed here took place nearly seven months prior to the death of Mrs. Burke. There was nothing tending to show that this relationship continued to a later period. The challenged evidence to the extent that it showed an adulterous relationship ought not to have been admitted.

The trial judge, of course, must be accorded a broad area of discretion in passing upon the admissibility of evidence of this type. We think, however, that the evidence here, unconnected with later events of like nature, was too remote. In cases where such evidence has been held admissible it will appear that the relationship shown was less remote in time. See *Commonwealth* v. *Howard,* 205 Mass. 128 (relationship continued to the time of wife's death); *Commonwealth* v. *Mercier,* 257 Mass. 353 (relationship continued until about three weeks before wife's death); *Commonwealth* v. *Bonomi,* 335 Mass. 327 (relationship continued until day wife disappeared). See also *Commonwealth* v. *Abbott,* 130 Mass. 472. We intend no suggestion that proof of hostility between the defendant and his wife in February and March would not have been competent. On the contrary, we think it would have been.

5. Duplin's testimony that Mrs. Burke said to him "Arrest him, arrest him," as he approached her was admissible and is not limited merely to showing the declarant's state of mind (assignment 8). Her utterance was a spontaneous exclamation, or, to put it another way, it constituted a part of what is commonly called the "res gestae" and is admissible under an exception to the hearsay rule for all purposes for which it may be relevant. *Commonwealth* v. *Hackett,* 2 Allen, 136, 139–140. *Commonwealth* v. *M'Pike,* 3 Cush. 181, 184. See *Correira* v. *Boston Motor Tours, Inc.* 270 Mass. 88, 91; Wigmore on Evidence (3d ed.) §§ 1747, 1749, 1750.

6. While the witness Wolinski was testifying the defendant was called upon to leave the dock, go to the floor of the

Newton *v.* Department of Public Utilities.

court room, and turn his back to the witness and look over his right shoulder (assignment 17). This was the position of the man that the witness saw leaving the body of Mrs. Burke on Broadsound Avenue. The defendant argues that this demonstration violated his right against self incrimination. The contention is without merit. *Holt* v. *United States*, 218 U. S. 245. *Commonwealth* v. *DiStasio*, 294 Mass. 273, 283–284.

7. One Topjian, a police chemist, was allowed to testify over objection and exception that he found a bloodstain one sixteenth of an inch in diameter on the front seat of the defendant's automobile (assignment 46). On cross-examination he testified that he was unable to determine whether the blood was human or animal and that he could not tell how long the stain had been there. This testimony should have been excluded. Its lack of relevancy is plain.

8. The judgment is reversed and the verdict is set aside.

*So ordered.*