COMMONWEALTH *vs.* WILLIAM ROBERT ELLIS.

Middlesex.    November 2, 1976. — July 1, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, & WILKINS, JJ.

*Evidence,* Opinion: expert; Exhibit; Business record; Competency; Relevancy and materiality; Death certificate. *Practice, Criminal,* Disclosure of evidence.

At a murder trial, the judge did not err in admitting ballistic evidence comparing the murder bullet and bullets from the alleged murder weapon which were fired into a tree in another State some four months before the crime; the absence of comparison photographs did not render the expert ballistic evidence inadmissible. [4-6]

Evidence at a murder trial warranted a finding that a record of the sale of a gun was made in good faith in the regular course of business and was therefore admissible at the trial. [6-7]

There was no abuse of discretion at a murder trial in admitting in evidence for illustrative purposes a gun which was similar but not identical to the alleged murder weapon which had not been recovered. [7]

At a murder trial, the judge did not abuse his discretion in admitting in evidence certain letters written several months before the crime which bore on the defendant's motive for killing the victim where there was other evidence substantiating the alleged motive. [7-8]

At a murder trial, no prejudicial error appeared in the admission of the victim's death certificate containing the word "homicide" as cause of death. [8-9]

No prejudicial error appeared at a murder trial in the failure of the Commonwealth to disclose to the defendant prior to the trial that no

1

fingerprints of the defendant were found on the victim's car and that a gunshot residue test on the defendant's hands revealed no nitrates. [9-10]

At a murder trial, there was no error in the admission of inculpatory statements made by the defendant at a police station to which the defendant had gone voluntarily where the conversation did not occur in custodial circumstances and the situation was not inherently coercive [10]; nor was any prejudice shown by the Commonwealth's inadvertent failure to deliver a copy of a police report of the conversation to the defendant when it voluntarily delivered other police reports to him [10].

INDICTMENT found and returned in the Superior Court on December 10, 1974.

The case was tried before *Moriarty, J.*

*Richard K. Donahue* for the defendant.

*James W. Sahakian,* Special Assistant District Attorney, for the Commonwealth.

WILKINS, J. The defendant was convicted of murder in the first degree of one Stephen G. DeVita. He appeals from that conviction and from the denial of his motion for a new trial, arguing a variety of issues, substantially all of which relate to rulings admitting evidence offered by the Commonwealth. We affirm the conviction.

In the early morning of October 6, 1974, the Lowell police received a telephone call that there had been an automobile accident on Hovey Street. When they arrived at the scene, they found DeVita in his automobile which had hit a tree. The doors of the car were locked; the window on the driver's side was down approximately four inches. DeVita died shortly after the police arrived. Although initially it appeared that DeVita had died in an automobile accident, and a death certificate to that effect was issued by the medical examiner, the funeral director noted what appeared to be a bullet wound and called the police. An autopsy disclosed that DeVita was killed, almost instantaneously, by a gunshot wound. The shot was fired from no farther than three feet away. The bullet entered near DeVita's nose and exited at the nape of his neck. The wound was consistent with having been caused by a .45 caliber projectile.

The police then conducted an investigation. Some neighbors recalled hearing a sound like a shot about 12:15 A.M. on October 6, 1974, followed by the noise of a car with a loud muffler racing away. The defendant's car had a defective muffler at that time. A spent .45 caliber projectile was found in DeVita's car, and a .45 caliber cartridge case was found on the street near the scene of the apparent automobile accident.

It developed that DeVita was engaged to marry one Jo-Ann Bonczar who lived on Hovey Street near the scene of the apparent accident. Attention turned to other young men whom Bonczar had dated. The defendant was one of those young men. He was interrogated on October 7, 1974, and said he was at home at the time of the shooting. He denied ownership of a gun and denied that he killed DeVita. The defendant had been a student in Mississippi until shortly before the killing. The Lowell police were in contact with police in Mississippi who soon discovered that the defendant had purchased a .45 caliber Star Garcia semiautomatic on October 1, 1974, from the City Pawn Shop in Hattiesburg. The gun's prior ownership was traced to one DeLancey, who had sold the gun to the City Pawn Shop on September 7, 1974. DeLancey directed the police to a tree into which he had fired the Star Garcia. The police obtained three spent projectiles from the tree and fourteen spent casings from the vicinity of the tree. Ballistics experts acting for the Commonwealth concluded that the casing found on the street in Lowell came from the same gun as the casings found in Mississippi. They also concluded that the spent projectile found in DeVita's car was fired from the same gun which fired at least one of the Mississippi projectiles. The murder weapon was never found. The defendant maintained on further questioning by the police, and at trial, that he had purchased the gun for someone else and turned it over to him immediately.

On September 25, 1974, Bonczar had told the defendant by telephone that she was planning to marry DeVita. He reacted angrily. The next day the defendant first

looked at guns at the Hattiesburg pawnshop. He made later unsuccessful attempts to reach Bonczar by telephone. On one such occasion Bonczar's mother told him of the engagement to DeVita and suggested he stop trying to talk with Bonczar. On October 1, 1974, the day the defendant purchased the gun, he withdrew from classes. He left Mississippi the next day and arrived in Lowell on October 4, 1974.

Soon after midnight on October 5, 1974, Bonczar and DeVita returned to her home from a visit to DeVita's sister. She entered the house alone. The call to the Lowell police concerning the automobile accident was made shortly thereafter.

This recitation of the evidence is sufficient to put the defendant's various arguments in perspective. Additional facts will be set forth when necessary to a discussion of individual contentions advanced by the defendant.

1. The defendant argues strenuously that the Commonwealth's ballistic evidence should have been excluded. Because the murder weapon was never found, the Commonwealth could not pursue the usual ballistic procedure of comparing (a) a cartridge casing or bullet apparently involved in the fatal shooting with (b) a cartridge casing or bullet obtained from test firings of the alleged murder weapon.

In previous opinions we have discussed and upheld the introduction of testimony from ballistic experts which tended to prove that a particular projectile was fired from a specific gun. *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 471 (1942). *Commonwealth* v. *Millen*, 289 Mass. 441, 483 (1935). *Commonwealth* v. *Best*, 180 Mass. 492, 495-496 (1902). In each of those cases, the weapon was available, and an expert testified concerning his comparison of a projectile involved in the crime and one or more projectiles which passed through the weapon following the crime. The admissibility of the expert testimony involving ballistic tests rests largely in the trial judge's discretion, as we have held generally with respect to out-of-court experiments. See *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 592-593 (1956).

In the case now before us, the absence of the murder weapon is not fatal to the admissibility of the expert testimony, and we do not understand the defendant to make that claim.[1] His argument is that the circumstances of the firings in Mississippi made the Mississippi projectiles and casings wholly unreliable as a basis for comparison with the bullet and shell found in Lowell. In essence, the claim is that, unlike a controlled experiment when a comparison bullet or cartridge casing is obtained by firing the murder weapon into cotton or into water, the firing of the Star Garcia into an oak tree made any attempted comparison invalid and, as matter of law, required the exclusion of expert testimony concerning any such comparison. The defendant argues that the Mississippi firings are analogous to an experiment whose dissimilarity to the Lowell firing is so great as to require the judge to exclude the expert testimony. See *Guinan* v. *Famous Players-Laskey Corp.*, 267 Mass. 501, 521-522 (1929); *Commonwealth* v. *Tucker*, 189 Mass. 457, 478-479 (1905).

We believe that the evidence was properly admitted in the judge's discretion. The weight to be given to the evidence was for the jury. The circumstances which might have made the comparison invalid were developed by the defendant. Four months elapsed between the two events; the gun had been fired in the interim; minute changes in the gun's markings on bullets presumably occurred; the objects struck by the bullets were obviously different. The Commonwealth's two experts did not fully agree. Each found adequate similarities between the murder bullet and at least one of the Mississippi projectiles to

---

[1] In other jurisdictions, expert testimony from ballisticians has been admitted, although the weapon used in the crime was not recovered. *State* v. *Lane,* 72 Ariz. 220, 225-226 (1951) (fired shell near victim's body compared with shells fired in target practice three or four weeks before the killing and picked up from a river bottom several months later). *People* v. *Williams,* 15 Mich. App. 683, 687-688 (1969) (shell casings at scene of second crime tied into shell casings found at murder scene). *State* v. *Boccadoro,* 105 N.J.L. 352, 354-355 (1929) (murder bullet compared with bullet fired into the ground two or three years earlier). Cf. *United States* v. *Bowers,* 534 F.2d 186, 193-194 (9th Cir.), cert. denied, 492 U.S. 942 (1976) (bullet found in victim's body compared to bullet found in defendant's attaché case).

testify that the two were fired from the same gun. One expert only found adequate similarities between another Mississippi bullet and the murder projectile in order to give an opinion that the same gun was used in each instance. There was no aura of infallibility in the expert opinions expressed on behalf of the Commonwealth, as the defendant's intensive cross-examination fully showed.

The jury could not have made its own informed comparisons from the various bullets and cartridges which were rightly introduced in evidence. Expert testimony was appropriate to assist the jury in determining whether the gun fired in Mississippi was or could have been the gun fired in Lowell. The question of the admission of this expert testimony was considered extensively on voir dire, and the judge was warranted in permitting the jury to hear it. The judge carefully charged the jury that expert testimony was merely evidence to be weighed with all the other evidence and that it was in no way binding on them.

The defendant argues that the expert testimony was improperly admitted because it was not accompanied by comparison photographs and the jury did not have a microscope to make their own comparison. We have upheld the introduction of photographs in connection with ballistic evidence. *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 471 (1942). There was evidence that not all ballisticians use photographs. The absence of photographs did not make the Commonwealth's expert ballistic evidence inadmissible. See *People* v. *Buckowski*, 37 Cal. 2d 629, 631 (1951), cert. denied, 342 U.S. 928 (1952) (oral testimony was sufficient; photographs were not necessary); *State* v. *White*, 321 So. 2d 491, 496 (La. 1975) (firearms expert properly permitted to testify to what he observed under a dual microscope, without photographs). The experts were able to testify informatively without photographs to assist in their presentations. We give little credence to the suggestion that the jury should have had their own microscope so that they could reach their own factual conclusions concerning the evidence.

2. The defendant objects to the admission of a certified

copy of a record of the sale of the Star Garcia to one Bonnie Pace on June 13, 1974. An investigator for the Mississippi highway patrol testified that on November 5, 1974, he obtained a document from the vendor, Howard Brothers Discount Stores, Inc. (Howard Brothers), and took it to a county Circuit Clerk's office where a copy was made and certified. The record showed the serial number of the gun Howard Brothers sold to Pace. De-Lancey testified that Pace purchased the gun from Howard Brothers in his presence on June 13, 1974, as a gift to him, and that the record, a copy of which was sought to be introduced, was prepared in his presence on that day. The judge was warranted in finding, as he impliedly did in admitting the copy of the record of the sale (*Commonwealth* v. *Baker*, 368 Mass. 58, 84 [1975]), that the "record was made in good faith in the regular course of business ...." G. L. c. 233, § 78. Even if that finding had not been warranted on the evidence, the admission of the record would not have been prejudicial error. There was ample other evidence to establish the serial number of the gun purchased by Delancey, including his own testimony.

3. The admission in evidence of a gun, similar but not identical, to the alleged murder weapon was not an abuse of discretion. *Commonwealth* v. *Russell*, 2 Mass. App. Ct. 293, 297-298 (1974). See *Everson* v. *Casualty Co. of America*, 208 Mass. 214, 220-221 (1911). On direction by the judge, the prosecution made it clear by questions that the model was not the murder weapon but was merely illustrative. The model was referred to by witnesses who testified for the Commonwealth. The defendant made no specific request for cautionary instructions concerning the gun. Although there was no need for the gun to be an exhibit which went to the jury room, there was no abuse of discretion in the judge's treatment of the gun.

4. The defendant challenges the admission of two letters which he wrote to Bonczar, one in November, 1973, and the other in January, 1974. He claims that the evidence was too remote. The first letter indicated his affection for Bonczar; the second showed the defendant's concern that

her feelings toward him were not all he wished. If these letters had been the only evidence of the relationship between Bonczar and the defendant, they might have been too remote to demonstrate the relationship between her and the defendant on the date of DeVita's death. *Commonwealth* v. *Burke,* 339 Mass. 521, 534 (1959). However, the trial judge "must be accorded a broad area of discretion in passing upon the admissibility of evidence of this type." *Id.* Here, there was evidence of the continuing interest of the defendant in Bonczar. She testified that in May, 1974, the defendant refused to shake hands with DeVita when she introduced them to each other. He got in his car and drove off without saying a word. There was evidence of the defendant's telephone calls to her home in September. The relationship between the defendant and Bonczar was material to the Commonwealth's case and the letters were admissible, in the judge's discretion, as part of the entire presentation. All this evidence bore on the defendant's motive for killing DeVita, a circumstance which the Commonwealth was entitled to show. *Commonwealth* v. *Borodine,* 371 Mass. 1, 8 (1976), cert. denied, 429 U.S. 1049 (1977). *Commonwealth* v. *Martin,* 357 Mass. 190, 192 (1970). *Commonwealth* v. *Bonomi,* 335 Mass. 327, 355 (1957).

5. A death certificate which listed homicide as the cause of death was admitted in evidence. The defendant argues that the portion of the certificate which listed homicide as the cause of DeVita's death should not have been disclosed to the jury. General Laws c. 46, § 19, as amended through St. 1969, c. 478, and as now amended (see St. 1976, c. 486, § 13), provides that "nothing contained in the record of a death which has reference to the question of liability for causing the death shall be admissible in evidence." The better and safer course is to exclude from a death certificate the words "homicide," "suicide," or "accident" in a criminal trial. See *Commonwealth* v. *Lannon,* 364 Mass. 480, 482 (1974). In the *Lannon* case, the defense argued that the death was "accidental" and that the word "homicide" on the death certificate was prejudicial to its case.

There, without accepting the claim that "homicide" implied liability for the death, we held that the judge's instructions and rulings obviated any prejudice. In *Commonwealth* v. *Coleman,* 366 Mass. 705, 711 (1975), where self-defense was asserted, we concluded that the word "homicide" was not prejudicially inconsistent with the asserted defense. Here the defense was alibi, a claim someone else must have shot DeVita because the defendant was elsewhere at the time of the shooting. We find no prejudicial error in the admission of the death certificate containing the word "homicide" as the cause of death.

6. The defendant argues that he was prejudiced in the preparation of his defense because the Commonwealth failed seasonably to disclose exculpatory evidence. The evidence which he asserts was not properly disclosed showed that no fingerprints of the defendant were on DeVita's automobile and that an October 10, 1974, gunshot residue test on the defendant's hands revealed no nitrates. The record shows that the defendant knew the results of the test before any evidence was introduced and that the Commonwealth produced the person who conducted the residue test and who was present when the automobile was inspected for fingerprints. The defendant made no particularized pre-trial motion for the results of tests. His pre-trial general motion for disclosure of exculpatory evidence was allowed. The Commonwealth argues that the results of each test were inconclusive and that the evidence did not have to be disclosed because the evidence was not material in the constitutional sense. See *United States* v. *Agurs,* 427 U.S. 97, 109-110 (1976).

Although the record shows that the tests were not definitive and that they were not clearly supportive of the defendant's innocence, we rest our decision, not on the ground that the test results were not exculpatory, but on the ground that there has been no showing of prejudice to the defendant. The defendant knew of the tests. The fact of their existence was brought out at trial. There has been no demonstration of any prejudicial delay in the disclosure of the results of the tests to the defendant. His

claim that the test results would have assisted him in his investigation and trial preparation is speculative and highly doubtful. There is no showing that the fingerprint tests would have aided the defendant in identifying any other person who might have shot DeVita. In the absence of prejudice, the defendant has not established a violation of his rights. *Commonwealth* v. *Dabrieo,* 370 Mass. 728, 744 (1976).

7. There was no error in admitting inculpatory statements made by the defendant at the Lowell police station on October 9, 1974. On that day, the defendant went to the police station voluntarily to inquire about the course of the investigation into DeVita's death. As he was about to leave, one of the officers asked him to return the next day, and the defendant agreed. The officers asked him, apparently in jest, to bring his .45 caliber pistol with him. The defendant said he would, but then said he did not own such a weapon. The defendant testified that he interpreted the conversation as a joke. Because no Miranda warnings had been given, the defendant argues that his statements were inadmissible. As the judge concluded, the conversation did not occur in custodial circumstances, and no Miranda warnings were required. *Commonwealth* v. *Borodine,* 371 Mass. 1, 3-5 (1976), cert. denied, 429 U.S. 1049 (1977). *Oregon* v. *Mathiason,* 429 U.S. 492, 495-496 (1977). *Beckwith* v. *United States,* 425 U.S. 341, 345-348 (1976). The situation was not inherently coercive.

The defendant also objects that the prosecution improperly withheld from him a copy of a police report of the October 9, 1974, conversation. The existence of the report came to the defendant's attention during a voir dire. Other police reports had been given to the defendant voluntarily. The defendant received the report before the officer who prepared it testified to the jury. The subject of the report should have been no surprise to the defendant who testified to the conversation himself. There was no prejudice in the Commonwealth's inadvertent failure to deliver the report to the defendant when it voluntarily delivered other police reports to him.

8. The defendant has argued that the judge erred in a variety of other rulings. We have considered each of these contentions, both individually and in their collective effect, but find no need to discuss them. As to evidentiary questions, the evidence in each instance was admitted properly in the judge's discretion. There was no prejudicial error in the judge's ruling which permitted the prosecutor to inspect the defendant's records at the Veterans' Administration hospital. No evidence concerning these records was admitted at the trial.

9. The denial of the defendant's motion for a new trial presents no independent question. The judge acted within his discretion in denying that motion.

10. We have considered the entire record and each of the defendant's arguments in light of our obligation under G. L. c. 278, § 33E, and find no occasion to order a new trial or to direct the entry of a lesser degree of guilt.

*Judgment affirmed.*