COMMONWEALTH vs. DENNIS BELDOTTI.

Norfolk. January 7, 1991. - March 14, 1991.

Present: LIACOS, C.J., WILKINS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Probable Cause. Practice, Criminal*, Indictment, Challenge to
jurors, Instructions to jury. *Constitutional Law*, Search and seizure.
*Search and Seizure*, Consent, Probable cause, Warrant, Affidavit. *Evidence*, Scientific test, Competency.

In a murder case, the evidence presented to the grand jury was sufficient to
establish probable cause to believe that the defendant committed the
crime charged. [554-555]

In a criminal case the judge correctly denied the defendant's motion to
suppress certain evidence, where his finding that the defendant con-
sented to the warrantless search of his house was supported by the rec-
ord. [555-556]

In a murder case, the judge properly ruled that certain photographs were
lawfully seized within the scope of a valid search warrant, and further
that, in any event, the photographs were in plain view in a closet that
was within the authorization of the warrant and reasonably were seized
as bearing on the proof of the defendant's guilt. [556-557]

There was no merit to a criminal defendant's challenge to the admissibility
of certain evidence on the ground that the magistrate lacked probable
cause to issue warrants to search the places where the evidence was
found [557], or on the ground that false information bearing on proba-
ble cause was set forth in an affidavit [559-560].

Suppression of the positive results of tests for occult blood on the fingers,
hands, and arms of a murder suspect was not required in circumstances
where the evidence, seized pursuant to an arguably defective warrant,
would have been seized almost immediately thereafter, without
prejudice to the defendant, pursuant to a lawful arrest or to a fully
supported search warrant. [557-559]

The defendant in a murder case demonstrated neither unfairness nor any
risk of a miscarriage of justice in the judge's conduct of the jury em-
panelment. [560-561]

At a murder trial, expert testimony that occult blood was detected in nu-
merous places and on numerous items in the defendant's house, in vari-
ous places in the defendant's automobile, on the defendant's hands and

arms and on the defendant's clothes and shoes was properly admitted in evidence. [561-562]

In a murder case the defendant demonstrated no substantial likelihood of a miscarriage of justice with respect to the judge's charge to the jury on reasonable doubt. [562]


INDICTMENT found and returned in the Superior Court Department on August 25, 1988.

A pretrial motion to suppress evidence was heard by *Roger J. Donahue*, J., and the case was tried before him.

*Henry D. Katz* for the defendant.

*Stephanie Martin Glennon*, Assistant District Attorney (*James Lang*, Assistant District Attorney, with her) for the Commonwealth.

WILKINS, J. Shortly after 2 P.M. on a hot August day in 1988, the defendant called the Needham police station to report that a woman's body was on the bathroom floor of his home, and he thought that she had been murdered. Within two minutes, a police officer arrived. The defendant told the officer where the body was. The officer found the nude, mutilated body of the victim on the floor of the upstairs bathroom. The defendant had operated a business out of his home, where he lived with his parents, and had maintained an office on the second floor of the house. The victim, who had come to work that morning, had performed bookkeeping and computing work for the defendant for more than a year.

The defendant was convicted of murder in the first degree. His appeal challenges the trial judge's denial of motions to dismiss the indictment and to suppress certain evidence seized in his home, in his motor vehicle, and from his person. He also raises challenges as to certain matters that occurred in the course of his trial. He makes no separate argument for relief under G. L. c. 278, § 33E (1988 ed.). We affirm the conviction. Such other facts as are necessary for a resolution of the issues will be presented where appropriate.

1. We reject the defendant's claim that the evidence before the grand jury did not justify the indictment. The grand jury

evidence was sufficient to establish probable cause to believe that the defendant committed the crime charged in the indictment. See *Commonwealth* v. *O'Dell*, 392 Mass. 445, 450 (1984); *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982). It need not have been sufficient to warrant a finding of guilt. *Commonwealth* v. *O'Dell*, *supra* at 450-451.

The evidence supporting the finding of probable cause includes the following facts. The victim was found strangled and mutilated in the upstairs bathroom of the defendant's home. Although the doors and windows were regularly kept locked, there was no sign of a forced entry. The victim had previously resisted the defendant's amorous interests in her. In his bedroom, the defendant had pictures of the victim in various stages of undress that had disappeared from the home of the victim and her husband. There was occult blood on the defendant's hands and arms, on his clothes, and in his motor vehicle. He had a fresh three-to-four inch scratch on his chest. The defendant had the opportunity to commit the murder. There was no corroboration of the defendant's alleged travel to Natick from Needham during significant portions of the day of the murder.[1]

2. We consider next the defendant's motion to suppress evidence, some of which the police seized without a search warrant and some of which was taken later pursuant to search warrants.

a. The judge found that the defendant consented to the warrantless search of the house after the police found the body. That finding is supported by the defendant's words and actions. He telephoned the police; he told them where the body was; he expressed deep emotional distress at the victim's death; he and his parents agreed to cooperate with the

---

[1]There is no substance to the defendant's claim that the integrity of the grand jury was impaired by the prosecution's alleged failure to present evidence to the grand jury concerning what occult blood was and its significance. Cf. *Commonwealth* v. *O'Dell*, *supra* at 445-449. There was evidence that occult blood is "nonvisible blood," that no blood type can be determined from it, and that the presence of occult blood can be detected for up to one month.

police and did so. The finding of consent makes untenable the claim of an unlawful search and seizure of evidence discovered after any exigency for a search of the premises had ended. The defendant's consent also makes inapplicable *Commonwealth* v. *Lewin (No. 1)*, 407 Mass. 617, 626 & n.4 (1990), and *Thompson* v. *Louisiana*, 469 U.S. 17, 18-19, 21 (1984), concerning warrantless searches of the scene of a homicide made without consent and after any exigency to search had ended.[2]

b. We come next to the denial of the defendant's motion to suppress evidence seized pursuant to search warrants and, of course, consider the defendant's challenges only as to seized evidence that was admitted at trial. Many of the items gathered pursuant to the warrant to search the defendant's home were items well within the authorization to seize "blood, evidence of a struggle, body parts, woman's clothing, fingerprints, instrumentality used to inflict the wounds on the body." The defendant himself placed in evidence the photographs of the victim that her husband had taken and the police had found in a locked closet in the defendant's bedroom.

The major focus of the defendant's argument is on the seizure from his bedroom closet of Polaroid photographs of portions of a nude female body, and the seizure from his bedroom of a camera with which to take Polaroid photographs.[3] The judge read the warrant as authorizing a search for evidence of a murder and thus concluded that the items seized were within the scope of the warrant. The warrant was not that broadly stated (and we need not decide, if it had been, whether it would have been particular enough to meet constitutional and statutory requirements). The photographs could

---

[2]Incidentally, the challenged evidence that was seized without a warrant and admitted in evidence was insignificant. The photographs of the victim's body lying on the bathroom floor show what police officers described in their testimony and what the pathologist noted and photographed during the autopsy. Nor was the defendant prejudiced by the admission of the limited amount of evidence of blood and occult blood that a State chemist collected before a search warrant was issued.

[3]There was evidence at trial that tended to show that the camera was used to take these photographs of the victim after her death.

have been seized for determining the presence of blood, and thus fall within the scope of the warrant.[4] Further, the judge found that the photographs were in plain view or in clear plastic folders and properly ruled that a search of the defendant's closet was within the authorization of the warrant. The police knew that a brutal sex crime had been committed. They could have reasonably concluded that the photographs might bear on the proof of guilt. See *Commonwealth* v. *Lett*, 393 Mass. 141, 148 (1984); *Commonwealth* v. *Bond*, 375 Mass. 201, 206 (1978).

The defendant argues that there was no probable cause to issue warrants to search him, his motor vehicle, or the vehicle the victim had driven to the defendant's home that morning. There was evidence before the clerk who issued the warrants that the defendant had used his motor vehicle on the day of the murder before he telephoned the police. There was probable cause to believe that evidence concerning the crime and who had committed it would be found in the house or its environs where the defendant's vehicle was parked. The victim's husband authorized the search of the vehicle that the victim had driven to work that day; the defendant had no standing to challenge the lawfulness of that search; and no evidence from that search was introduced at trial.

The defendant contends that a State chemist tested his body for signs of occult blood pursuant to a search warrant that was issued without a showing of probable cause to believe that there was a logical link between him and the apparent criminal activity. The test disclosed occult, or invisible, blood on his fingers, hands, and arms. The judge did not discuss this search explicitly in his findings and rulings on the defendant's various motions. Nor does the record disclose in detail the circumstances under which the defendant was tested. It is clear, however, that the State chemist conducted the test at a hospital in Needham after the search warrant

---

[4]The fact that they were not tested for occult blood does not alter that fact, and, considering that they were postmortem pictures, the defendant may have benefited from the failure to test them for blood.

had been issued. It is also clear that, shortly before the tests on the defendant's body, he had voluntarily turned his clothes over to the police for testing after consulting with his attorney who was present. His consent to the testing of his body for occult blood might be presumed in the circumstances because of the defendant's substantial prior cooperation, but the search warrant arrived and the question of consent to the testing was apparently never raised.

Neither the defendant nor the Commonwealth cites any authority that defines the test that the Commonwealth must satisfy in order validly to obtain a warrant to search for occult blood on a person in the position of the defendant. There was certainly reason to believe that the presence or absence of occult blood on the defendant would be relevant to his guilt or innocence. Perhaps, however, the standard is a stricter one, and for the purposes of deciding this issue we shall assume that it is.

The affidavit in support of the search warrant disclosed the following relevant facts. The defendant's employee, who worked in an office on the second floor of his home, was found murdered in a second floor bathroom. The defendant said he discovered the body, and, as far as was known, he was the last person to have seen her alive. He knew who the victim was, although the police found the body wrapped in green trash bags. Certainly the affidavit did not provide probable cause to arrest the defendant, and, if probable cause is the standard that must have been met for the issuance of a valid warrant authorizing the search for occult blood on the defendant's body, the warrant was not properly issued.

We know that, about the same time as the testing of the defendant and also acting pursuant to a search warrant, the police were finding evidence in the defendant's closet that tended to show that he had taken nude pictures of the victim. The better inference is that the search of the closet followed the testing for occult blood by less than an hour. Evidence from the closet provided probable cause to believe that the defendant committed the murder and would have justified both (1) his arrest and a warrantless search for occult blood

on him and (2) the issuance of a warrant to do exactly what the chemist had already done. There is a basis, therefore, to conclude that, even if the testing for occult blood was unlawful because the warrant was issued without probable cause to do so, the same evidence could have been obtained, without any prejudice to the defendant's case, within a short time of the initial testing pursuant either to a lawful arrest or to a proper search warrant. Cf. *Commonwealth* v. *O'Connor*, 406 Mass. 112, 118-119 (1989), concerning this court's view of the inevitable discovery rule under art. 14 of the Massachusetts Declaration of Rights, rejecting the idea that a *warrantless* search could be upheld because a search warrant could have been obtained.

In the circumstances of this case, the exclusion of evidence of occult blood on the defendant would seem not to serve the deterrent purpose of the exclusionary rule. The intrusion was minimal, simply a test of the defendant's hands and arms for objective evidence of blood. Even if it was a search in the constitutional sense, the police did obtain a warrant. The police should be encouraged to seek search warrants, and it would be anomalous, where the defendant probably would have consented to the search, if obtaining a defective warrant should require suppression. Although the police obtained evidence pursuant to an arguably defective warrant, they could have seized the same evidence almost immediately pursuant to a lawful arrest or to a fully supported search warrant. For the reasons that we have stated, suppression was not required. In concluding as we do, we do not rely on any theory the police were proceeding in good faith reliance of a defective search warrant.

There is no merit to the defendant's claim that evidence seized in his house pursuant to a search warrant issued on August 30, 1988, should have been suppressed. The search resulted in the seizure of a bedspread that the Commonwealth asserted was shown in the postmortem photographs of the victim's body that were found in the defendant's closet. The defendant has failed to support his claim that false information was knowingly or recklessly set forth in the affida-

vit submitted in support of the warrant. See *Franks* v. *Delaware*, 438 U.S. 154, 155-156 (1978). Indeed, the defendant has failed to show that any information in the affidavit was false or that the allegedly false information was essential to a finding of probable cause to conduct the search. *Id. Commonwealth* v. *Assad*, 393 Mass. 418, 422 (1984).

3. The defendant contends, for the first time on appeal, that he was denied a fair trial because the judge restricted his use of peremptory challenges. The circumstances we shall describe show the unacceptability of this belated claim.[5]

At the commencement of the jury selection process on January 17, 1989, the judge announced that he planned to empanel a jury of sixteen. The defendant was, therefore, entitled to sixteen peremptory challenges. Mass. R. Crim. P. 20 (c) (1), 378 Mass. 889 (1979). The judge proceeded diligently through the day in the selection process. By 6:45 P.M. there were fourteen jurors whom the judge had found to be indifferent and that neither the defendant nor the Commonwealth had peremptorily challenged. At that point, the defendant had used nine challenges. The judge announced that he would proceed with fifteen jurors if the juror that he had just declared to be indifferent proved to be acceptable to counsel. The defendant challenged the juror but did not object to the judge's announced plan to proceed with fewer than sixteen jurors.

The jury selection process continued. After six more members of the venire had been excused for cause, the judge declared another person to be indifferent, adding that he might proceed with fourteen jurors and that he had been trying to obtain a jury for almost ten hours. The defendant challenged the juror but again made no objection to the judge's indication that he might proceed with fewer than sixteen jurors. The judge then stated that he was not required to empanel more than twelve jurors and that the fourteen empaneled jurors would hear the case. Once more, the defendant did not

---

[5]The defendant makes no explicit reference to the Constitution of the Commonwealth and relies on Federal due process of law principles.

object. Most particularly, he did not claim that he would have exercised his peremptory challenges differently if he had known that only fourteen jurors were to be seated. If such a circumstance were true, surely defense counsel should have and would have immediately argued the point.

The judge violated no principle of State law in proceeding as he did, and, in the absence of a showing of unfairness, no Federal due process principle was violated. *Ross* v. *Oklahoma*, 487 U.S. 81, 89 (1988) ("the [due process] 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides"). Moreover, in the absence of objection, we test the defendant's argument under G. L. c. 278, § 33E, to see whether he has shown a substantial likelihood of a miscarriage of justice. See G. L. c. 234, § 32 (1988 ed.). He has shown neither unfairness nor any indication of a miscarriage of justice.

4. We reject the defendant's claim that the judge erred in admitting expert testimony that occult blood was detected in numerous places and on numerous items in the house, in various places in the defendant's motor vehicle, on the defendant's hands and arms, and on the shoes and shorts that the defendant was wearing when the police arrived at his home. This court's recent opinion in *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 744-745 (1990), allowing the admission of evidence of occult blood, is wholly dispositive of this issue.[6] The evidence, although not overpowering, is relevant in showing that the defendant and parts of his home and motor vehicle had had contact with blood, human or otherwise, in

---

[6]The *Yesilciman* opinion implicitly overruled *Commonwealth* v. *Burke*, 339 Mass. 521, 535 (1959) (holding irrelevant evidence of one-sixteenth inch wide blood stain of undetermined age, and not shown to be human). Our opinions since the *Burke* opinion, and before the *Yesilciman* opinion, have appeared to be ambivalent on the continued viability of the *Burke* principle. See *Commonwealth* v. *Nadworny*, 396 Mass. 342, 365 (1985), cert. denied, 477 U.S. 904 (1986). We here explicitly overrule the *Burke* case on this point.

the recent past and that that blood had been cleaned up or otherwise disappeared.

5. The defendant challenges, for the first time on appeal, two aspects of the judge's charge on reasonable doubt. In neither has the defendant shown a substantial likelihood of a miscarriage of justice. In fact, there was no error at all in the use of the words "moral certainty," as part of or in conjunction with the approved charge from *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850). Unless the judge uses those words in isolation, their use presents no problem. See *Lanigan* v. *Maloney*, 853 F.2d 40, 43 (1st Cir. 1988), cert. denied, 488 U.S. 1007 (1989), where, commenting on the *Webster* charge, the court said that it is "hard to imagine, without recourse to prolixity, a charge more reflective of the solemn and rigorous standard intended." Contrast *Cage* v. *Louisiana*, 111 S. Ct. 328, 330 (1990).

The defendant's other contention is that the judge's observations on reasonable doubt, presented to the jury before he gave the *Webster* charge, were prejudicial. These remarks were what we have called "freehand embellishments of the standard charge" of the type that judges should avoid. See *Commonwealth* v. *Therrien*, 371 Mass. 203, 208 (1976). In particular, the defendant complains of the judge's statement that "we are dealing with human beings and human affairs and human memory, and so on and so forth, so we do not require the government to prove its case beyond all doubt." We also note that the judge charged that the Commonwealth does not have the burden of "proving that someone else did not commit the crime." Perhaps these statements, standing alone, could be taken as tending to downgrade the Commonwealth's burden of proof. In this case, however, they certainly did not because the *Webster* charge was given and, viewing the charge as a whole, we see no such possibility.

6. The defendant is not entitled to relief under G. L. c. 278, § 33E.

*Judgment affirmed.*